## BARR *v.* PITTSBURGH PLATE GLASS Co. *et al.*

### (*Circuit Court, W. D. Pennsylvania.* May 9, 1892.)

#### No. 22.

**1. CORPORATIONS—DIRECTORS—INDEPENDENT BUSINESS.**

Directors, who are also officers, of a manufacturing corporation, if acting in positive good faith to the corporation and their costockholders, are not precluded from engaging in the building and operation of other distinct works in the same general business, (here the manufacture of plate glass,) and they do not stand, in respect to said works, in any trust relation to the corporation.

**2. SAME—EQUITY.**

A stockholder in a manufacturing corporation with his own funds bought land, and began the erection of independent works. He was joined in the enterprise by a director of the company. Both were acting in good faith to the corporation. A consolidation of the new works with those of the corporation was effected on a stock basis upon terms approved by the unanimous vote of a stockholders' meeting, the plaintiff himself voting in favor of the scheme. Two years later, dissatisfaction being expressed by some stockholders, the former owners of the new works offered to rescind the transaction, but the stockholders, by a practically unanimous vote, declined. The plaintiff, by his subsequent bill, sought to exact terms more favorable to the corporation. *Held,* that neither the corporation nor the plaintiff had any equity to support such a demand.

**SAME.**

The directors and one other stockholder of a manufacturing corporation, owning among themselves a majority of the stock, conceived that the demands of trade required the erection of additional works, which they desired the corporation to build, but the project was defeated by minority stockholders. The projectors then proceeded with their own funds to build independent works. Bad faith to the corporation was not imputable to any of them. When the works were nearing completion the corporation bought them upon terms not unconscionable in themselves, and which had been approved by a stock vote of 16,706 to 1,174 shares. The vendors, desiring to have the question decided by the minority stockholders, withheld their own votes until a large majority of the other stockholders had voted in favor of the purchase, and then cast their votes with the majority of the minority. The plaintiff, a minority stockholder, by his bill sought not a rescission of the contract, but to reduce the vendors' profit. *Held,* that neither he nor the corporation was entitled to relief.

In Equity. Suit by Samuel F. Barr against the Pittsburgh Plate Glass Company and others. Bill dismissed. For former report, see 40 Fed. Rep. 412.

*S. Schoyer,* for complainant.

*D. T. Watson,* for defendants.

ACHESON, Circuit Judge. This bill was filed on May 8, 1889, by Samuel F. Barr, who owns 198 shares out of a total capital of 20,000 shares of the stock of the Pittsburgh Plate Glass Company, which company was incorporated to manufacture plate glass in Allegheny county, Pa., and erected its works at Creighton. It is a stockholders' bill seeking relief, on behalf of the corporation, against J. B. Ford, Edward Ford, Emory L. Ford, Artemus Pitcairn, and John Pitcairn, Jr., and was filed by said plaintiff on the ground that the last-named defendants, as directors, officers, and majority stockholders, control the corporation, and prevent a suit by the corporation itself. The bill charges that these defendants—all of whom, except J. B. Ford, were directors of the company—entered into a combination and conspiracy to erect at Tarentum, in said county, about one half mile above the plate glass works at Creighton, similar works of greater capacity, and to compel said company to pur-

chase the same at such price as they should name, in order to prevent
a dangerous and destructive competition therefrom, and that according-
ly, by their votes, constituting a majority of the stock, they did force
the company to purchase the same at an excessive price, namely, 10,000
shares of the capital stock of the company, of the par value of $1,000,-
000, but worth much more in the market. And the bill further charges
that the same defendants have entered into a combination and conspiracy
to erect other like works at Ford City, in Armstrong county, Pa., and
to compel the company to purchase the same at such price as they may
see fit it to exact, by reason of the menace of ruinous competition which
said works so constructed would present. That they have proposed to
sell said works to said company for $750,000 of its mortgage bonds and
$750,000 of its capital stock at par, which stock commands a large pre-
mium; whereas the works, when completed, will not cost, as the plaintiff
is informed and believes, more than $1,000,000. That said defendants
own seven tenths of the capital stock of the company, and John Pitcairn,
Edward Ford, Artemus Pitcairn, and Emory L. Ford are the directors
now in office, the last three named respectively filling the offices of pres-
ident, vice president, and secretary of the company; and that by their
undue influence they have procured a vote authorizing the acceptance
of their said offer, and to that end steps have been taken to procure an
amendment of its charter to enable the company to carry on business in
other counties besides Allegheny. This is the substance of the complaints
set forth in the bill.

The proofs are unusually voluminous, and cannot be here recited with
any particularity, without extending this opinion to an unreasonable
length. I must then content myself with a mere statement of the ma-
terial facts as I find them from the evidence, with the conclusions I have
reached. It appears that the defendant Capt. J. B. Ford, acting for
himself solely, purchased land at Tarentum, with a view of erecting
thereon plate glass works, and in 1885, after the Creighton works were
in successful operation, commenced clearing the land for building. This
was done by him without consultation with, or the knowledge of, any one
of the other defendants. When the defendants Edward and Emory L.
Ford, his sons, learned of their father's intention, they endeavored to
dissuade him, mainly because of his advanced age, which was then 74
years; but he remained fixed in his purpose. John Pitcairn also re-
monstrated with him against his project, but in vain. Capt. Ford took
the position that the plate glass business was a new and growing indus-
try in the United States, and that the demand for plate glass was largely
in excess of the home supply; that Creighton could not fill its orders,
and the Tarentum works would not come into unfriendly competition
with the Creighton works, nor at all injure the Pittsburgh Plate Glass
Company. Undoubtedly these views were honestly entertained by Capt.
Ford. He was a large stockholder in the Pittsburgh Plate Glass Com-
pany. His two sons were also stockholders therein. It would then be
unreasonable to suppose that he intended to injure the company. I am
entirely satisfied from the evidence that in this matter he acted in good

faith to the company and to his fellow shareholders. John Pitcairn having failed to turn Capt. Ford from his purpose, with the approbation of several of the principal stockholders in said company, in order to prevent the possibility of the Tarentum works falling into hands less friendly to the old company, on October 6, 1885, entered into a written agreement with Capt. Ford to take a half interest with him in the new enterprise. I find that in so doing Mr. Pitcairn acted in entire good faith towards his associates in the Pittsburgh Plate Glass Company. When the Tarentum works were approaching completion, John Scott, a large stockholder and a director in said company, who had no other connection with the defendants, inaugurated a movement for the acquisition by the company of the new works, or the consolidation of the two concerns. As the result of Mr. Scott's interposition, and at his instance, after negotiations between him and Capt. Ford and John Pitcairn, the two latter submitted an offer in writing to the board of directors of the company for the sale of the Tarentum works to the company. At a meeting of the board on July 2, 1886, on the motion of John Scott, the board recommended the acceptance of the offer, and called a meeting of the stockholders for September 6, 1886, to consider the matter, and act thereon. Pursuant to proper notice, a stockholders' meeting was held on September 6, 1886. During the discussion which took place, Capt. Ford and John Pitcairn were asked to state the cost of the Tarentum works, but this they publicly refused to do, upon the ground that the basis of the proposed consolidation was the capacity for production of the two works. They, however, made a modification, favorable to the company, of their offer, which then was substantially this, namely: That Creighton should represent a capital stock of $800,000, subject to a mortgage of $134,000, and Tarentum should represent a capital stock of $1,000,000; that the capital stock of the company should be increased from $600,000, which it then was, to $2,000,000; that of this stock increase $200,000 should be distributed among the Creighton stockholders, to represent earnings which it was alleged had gone into that plant; that $1,000,000 of the stock should be issued to and accepted by Capt. Ford and John Pitcairn as the price for the Tarentum works completed, the remaining $200,000 of the stock to be used to supply working capital. This proposition was accepted by the meeting without dissent, and the issue of the stock to carry out the arrangement was authorized by the unanimous vote of all the stockholders present, including Barr, the plaintiff. The stock vote in favor of the new issue was 5,515 shares out of a total of 5,950 shares outstanding. It does not appear that any holder of the 435 shares of stock not there represented has ever objected to the action of that meeting. Soon after the meeting, the contract was carried into effect. On October 27, 1886, J. B. Ford and John Pitcairn conveyed the Tarentum works and property to the Pittsburgh Plate Glass Company, which took and has maintained possession thereof. The new stock was issued and disposed of as agreed upon, except that $200,000 thereof remained in the hands of the company as security for the faithful performance by Messrs. Ford and Pitcairn of their undertaking to finish the

works at their own cost. Messrs. Ford and Pitcairn having asked for said stock at a board meeting held April 17, 1888, the board directed the treasurer to deliver it.    But John Scott filed a protest against this action, and the stock was not delivered.    At a later board meeting on November 20, 1888, several stockholders joined in a communication to the board protesting against the issue of this stock to Messrs. Ford and Pitcairn for the expressed reason "that they, in violation of the duty they owed the company and its stockholders, exacted and voted to themselves, and have already received from the company, a price for said works grossly in excess of the cost and value thereof, and have no claim, either in law or conscience, to the stock now demanded by them;" and these protesting stockholders therefore insisted that the board should refuse to comply with the request of Ford and Pitcairn, "at least until after a full and fair investigation of these matters, and action thereon by the stockholders of the company, at a meeting, to be held, called for that purpose;" and it was added that, if this request was not complied with, recourse would be had to the courts.    Accordingly a stockholders' meeting was called for and convened on December 5, 1888.    At that meeting, the protest having been read, Mr. Pitcairn presented a written communication signed by himself and Capt. Ford, offering to rescind the contract between them and the Pittsburgh Plate Glass Company by which the company acquired the Tarentum works.    The result of the meeting was the adoption of a resolution "that a committee of five be appointed to thoroughly investigate all the circumstances connected with this complaint and this proposition of Mr. Pitcairn's, and also to recommend a course of action for the minority stockholders, and that their report be made at the next regular annual meeting of the company to be held in January."    The committee appointed under this resolution was composed altogether of minority stockholders, and two of them were signers of the protest already referred to.    The committee, after a complete investigation, made its unanimous report to the meeting of the stockholders held January 22, 1889, at which 19,369 shares of stock out of a total of 20,000 shares were represented.    The report concluded thus:

"But, in our judgment, the acquisition of the Tarentum works has been, on the whole, favorable to the general interests of the company, and the transaction should not be disturbed.    In regard to the proposition of J. B. Ford & Company for a reconveyance of the Tarentum works, we recommend that it be not entertained."

A motion was made, seconded, and carried that the recommendations of the report be adopted.    Perhaps a single vote was cast against the motion, but no more.    In pursuance of the action of this meeting, the $200,000 of stock was issued to Messrs. Ford and Pitcairn.

The charge made in the bill, that the defendants against whom relief is sought entered into a combination and conspiracy to erect the Tarentum works, and then coerce the Pittsburgh Plate Glass Company to purchase them, is not sustained by the proofs.    Neither Edward Ford, Emory L. Ford, nor Artemus Pitcairn had any interest whatever in Tarentum; nor did any of them promote that project.    On the contrary, they all opposed

it. Actual fraud in this transaction is not justly imputable to any of the defendants. There was here no resulting trust, for the land was bought and improved exclusively with the moneys of Capt. Ford and John Pitcairn. Neither was there any trust *ex maleficio*. Capt. Ford was neither a director nor an officer of the company. The fact that he was a stockholder did not preclude him, acting in good faith, from going into another and independent corporation or partnership organized to prosecute the great industry of making plate glass. He was not the agent of the Pittsburgh Plate Glass Company for any purpose, nor was he acting in any fiduciary capacity for that company. The company was not seeking to acquire, and did not need for its business, the land at Tarentum which Ford bought. Pitcairn joined Ford in his enterprise, not in hostility to, but really to subserve, as he believed, the interests of, the Pittsburgh Plate Glass Company. I do not understand how the new works were a menace to Creighton, which was not able to fill its orders. The demand for plate glass greatly exceeded the home supply from all quarters, and was on the increase. There was no intention on the part of Messrs. Ford and Pitcairn to run Tarentum as rival works, or to the detriment of the old company. The proposition that the Pittsburgh Plate Glass Company should acquire Tarentum did not originate with Messrs. Ford and Pitcairn, but with John Scott, who therein was acting in the interest of the company. It is not pretended that Capt. Ford or John Pitcairn made any false representation as to the cost of the Tarentum works. The complaint is that they refused to disclose the cost. But this refusal, with the reason therefor, was openly declared in the stockholders' meeting of September 6, 1886, and the stockholders waived such disclosure. It is difficult to see how the plaintiff, Barr, or any other stockholder who, like him, participated in the meeting of September 6, 1886, and voted for the acquisition of Tarentum, could afterwards impeach the transaction. But, if this was open to any stockholder, prompt action to that end was necessary. All the stockholders, however, acquiesced in the consummation of the consolidation agreed on, and reaped the fruits thereof in stock dividends and otherwise. Then, after the lapse of two years, when complaint was made by minority stockholders, after an investigation conducted by a committee of their own class, the stockholders, in general meeting assembled, upon the recommendation of the whole committee, by a practically unanimous vote, refused to disturb the transaction, and declined the offer of Messrs. Ford and Pitcairn to rescind. The contract, indeed, had really proved to be a beneficial one to the Pittsburgh Plate Glass Company, and rescission was not desirable on the part of that company. It is not even now proposed to have the contract rescinded, but the proposition is that, while the company shall retain all the benefits resulting from the transaction, Messrs. Ford and Pitcairn shall be deprived of a part of the consideration they accepted for their conveyance of the Tarentum works. But neither the plaintiff nor the Pittsburgh Plate Glass Company has any equity to support such a demand.

We now turn to that branch of the case which concerns the works at Ford City. In the summer of 1887 the condition and prospects of the plate glass business were such that it appeared to J. B. Ford and John Pitcairn expedient that new works should be erected speedily, and they fixed upon a site in Armstrong county, Pa., which seemed to them to be peculiarly well adapted for that object, and they took options of purchase from the landowners to secure the location. On September 8, 1887, at a special and full meeting of the board of directors of the Pittsburgh Plate Glass Company convened with reference to this project, on the motion of John Scott it was unanimously recommended to the stockholders that new works be erected, and a special meeting of the stockholders to consider the matter was called by the board for September, 20, 1887. On that day the stockholders' meeting was held. The recommendation of the board was read, and John Pitcairn advocated the erection of new works by the company. But the minority stockholders, under the lead of Mr. Barr, the plaintiff, opposed the project. The plaintiff was very earnest in his opposition, and finally raised the objection that the company, under its charter, had no power to carry on operations in Armstrong county. The witnesses differ, in some particulars, as to what occurred at this meeting; but according to the preponderating weight of the evidence the question whether the company should build new works at all was submitted to vote, and was defeated by the votes of the minority stockholders, including the negative vote of the plaintiff himself. The defendants refrained from voting on that occasion because, holding the majority of the stock, they did not wish to force their views upon the minority stockholders. Their good faith in that course of action has been questioned, but I think without sufficient cause. It was openly stated at this meeting, and was generally understood by those present, that if the company refused to build new works these defendants would do so at the site proposed. Accordingly they subsequently formed a partnership under the name of J. B. Ford & Co., and with their own moneys they purchased the lands for which options had been taken, and proceeded to erect what are now known as the "Ford City Plate Glass Works."

At the general annual stockholders' meeting held on January 22, 1889, a resolution was adopted that a committee of five stockholders be appointed to negotiate with J. B. Ford & Co. for a transfer of the Ford City works to the Pittsburgh Plate Glass Company, and report to a subsequent meeting. The same five minority stockholders who had acted in the Tarentum matter constituted that committee. They had a number of conferences with J. B. Ford & Co., at one of which the latter confidentially communicated to them the approximate cost of the works when completed. Eventually, J. B. Ford & Co. submitted to the committee a proposition to sell the Ford City works for the price of $1,500,000, to be paid $750,000 in the stock and $750,000 in the bonds of the Pittsburgh Plate Glass Company, the bonds running three, four, and five years, with interest. A special stockholders' meeting was called

for and held on April 9, 1889, to consider the committee's report. Two reports were submitted. All agreed in recommending the purchase at the price named; and the majority report, signed by four of the committee, recommended the acceptance of the offer made by J. B. Ford & Co. The minority report, signed by one member of the committee, recommended that $1,000,000 of the purchase price be paid in the bonds of the company, and the remaining $500,000 be paid in cash, to be raised by the issue and sale of stock. After free and extended discussion, the meeting adjourned until April 16, 1889, and then reconvened. The plaintiff, Barr, participated in the proceedings of both these meetings. He advocated the payment of the purchase money in long time bonds, but this proposition was not received with favor. At the second or adjourned meeting he moved the adoption of the minority report, but this motion was lost. Finally, a vote was taken on a motion for the adoption of the majority report. Before the vote was taken on this motion, J. B. Ford & Co. announced that they desired to have the question decided by the votes of the minority stockholders; and to that end they authorized the tellers to cast their votes—14,362 shares—with the majority of the minority. The minority stockholders then cast 2,344 votes in favor of and 1,174 votes against the motion, and thereupon, the votes of J. B. Ford & Co. being cast in favor of the motion, the report of the majority of the committee was adopted by a stock vote of 16,706 to 1,174. The meeting then adopted a resolution to take steps to amend the charter so as to authorize the company to manufacture in Armstrong county. On the next day—April 17, 1889—the board of directors called a meeting of the stockholders for June 18, 1889, to pass upon the proposed increase of stock and indebtedness to carry out the purchase. Such meeting was accordingly held, and the increase of stock and bonded indebtedness was authorized by a stock vote of 17,205 shares, no share voting to the contrary. Possession of the Ford City works was delivered to the Pittsburgh Plate Glass Company on July 1, 1889, and subsequently the contract between the company and J. B. Ford & Co. was carried into full execution.

The proofs do not sustain the averment of the bill that the defendants here sought to be charged entered into a combination and conspiracy to erect the Ford City works, and then force them upon the Pittsburgh Plate Glass Company; and, upon the whole evidence, bad faith is not attributable to any of these defendants. Nor do I discover any basis for the plaintiff's theory that, with respect to the Ford City enterprise, a trust relation existed between the Pittsburgh Plate Glass Company and the other defendants. Capt. Ford owned the one third of the Ford City works, and all that has been said respecting him in connection with his purchase at Tarentum and the erection of those works applies here. Then, as to the other defendants, so long as they acted with good faith to their associates in the Pittsburgh Plate Glass Company, I am not prepared to say that the fact that they were directors and officers in that company debarred them from engaging in the independent manufacture of plate glass, especially in a place where that company was not

authorized by its charter to operate. The Pittsburgh Plate Glass Company did not have, and could not expect to maintain, a monopoly of this growing industry. That the building of the Ford City works was in itself a "menace" to that company is an unwarrantable assumption. Moreover, those works were in friendly hands. It is incredible that the defendants would have run them to the prejudice of a company in which they had interests so large. In fact, John Pitcairn's interest in the old company was greater than his interest in the Ford City works. I am entirely satisfied that none of these defendants entertained any hostile or improper design against the Pittsburgh Plate Glass Company. The proofs are quite convincing that their original purpose was to have the company itself build the works, but this purpose was defeated in the manner already stated.

The contract here in question seems to have been freely and fairly entered into. The defendants, holding the controlling interest in the stock of the company, in the first instance, permitted the minority stockholders to determine by their votes whether the offer of sale should be accepted. The bargain does not appear to be unconscionable. The Ford City works cost very nearly $1,200,000, and the proofs show that $300,000 would not be an excessive profit for a contractor who had incurred the risks involved in such an undertaking. The works are first-class, and probably could have been disposed of to others upon terms as favorable to J. B. Ford & Co. as those here agreed on. The suggestion that J. B. Ford & Co. realized an undue gain by reason of the market rate of the stock they received does not strike me as having any special force. The new assets they brought into the concern had very great value, and not only kept up the market value of the stock, but, without any doubt, contributed largely to the further advance which soon followed. The truth is, the acquisition of those works has been highly advantageous to the Pittsburgh Plate Glass Company. Hence no one is now seeking to set aside the transaction. The relief prayed for is not rescission, but a reduction of the profits which accrued to J. B. Ford & Co. Virtually the court is asked to make a new contract between these parties. Upon the most patient investigation of all the facts, I am unable to see that there is here presented a case which rightfully calls for any equitable relief. Let a decree be drawn dismissing the bill. with costs.