W. H. YOUNG *et al. v.* THE COLUMBIA OIL COMPANY OF WEST
VIRGINIA *et al.*

(No. 6535)

Submitted March 17, 1931.  Decided April 21, 1931.
(Rehearing denied June 9, 1931.)

*M. H. Willis, J. B. Handlan, J. H. McCoy, Clyde B. John-
son,* and *Lively & Stambaugh,* for appellants.

*G. Alan Garden,* for appellee J. C. Jones.

*Hoffheimer & Stotler, Melvin G. Sperry, I. M. Underwood*
and *K. C. Moore,* for other appellees.

WOODS, JUDGE:

This suit was instituted by the minority stockholders of the Columbia Oil Company of West Virginia for the purpose of having certain persons, operating as the Greybull Oil Company, a partnership, by reason of their fiduciary relation to said corporation and the Big Horn Oil & Gas Company, a corporation, declared to be trustees as to certain profits made by them and taken to their own use, and that they be required to account for such profits. The circuit court of Tyler county found for the defendants, and dismissed plaintiffs' bill.

The record in this case, over six thousand pages, exclusive of three volumes of exhibits, makes a full recital of the facts practically impossible, so we will limit this statement to such facts as we conceive to be determinative of the issues involved. The Columbia, whose principal office and place of business is at Sistersville, Tyler county, was organized in 1907 under the laws of West Virginia, with an authorized capital stock of $150,000, which was later increased to $500,000, divided into 5,000 shares of the par value of $100 each, all issued and outstanding at the commencement of this suit. It operated for and produced oil and gas. Its business, first confined to a field in Illinois, was extended to certain fields in Wyoming, Ohio, West Virginia and Oklahoma.

The effort on the part of Thomas Alford, George L. Alford and Homer T. Lamb to secure capital with which to increase their holdings in Wyoming culminated (in 1908) in the formation of the Big Horn Oil & Gas Company, a Wyoming corporation, with an authorized capital stock of $80,000, ⅝ of which was taken in the names of certain directors of the Columbia Oil Company of West Virginia, for its benefit. The Columbia later acquired the interests of the Alford brothers, making its interest ⅞ to Lamb's ⅛. A number of properties in and around Basin and Greybull, Wyoming, were secured through purchase, lease and government placer claims. Gas was discovered early in the activities of the Big Horn, and the two towns were piped for gas. During the winter of 1911-12 the gas supply began to wane, and in 1912-13 there

was actual suffering because of the shortage. The citizens petitioned the members of Congress from Wyoming to use every effort to secure the release of lands in the vicinity in order that the same might be explored for gas, stating therein that the local gas company stood ready to make said explorations.

During the entire year 1912 and up to the middle of July, 1913, the Big Horn, with the aid of certain congressmen from Wyoming and West Virginia, had been endeavoring to hasten the issuance of patents for the ''George Alford No. 1,'' the ''Islands'' and ''Alford No. 9'' claims, which had been pending for several years. The first claim had been located (October, 1908) in the names of Thomas Alford, George L. Alford, Homer T. Lamb and Winfield S. Collins, and their respective wives; and the third (November, 1909) in the names of A. C. Jackson, J. C. Jones, W. J. Neuenschwander, Tim Cushing, Thomas Chestnut, Charles N. Kimball, George F. Durham and Sim Armstrong (all stockholders in Columbia, the first five being directors therein, and the first six directors in the Big Horn). After a series of investigations by the Government covering a considerable period, defendant Kimball, during a trip to Washington (July 9-11, 1913), in this behalf, was advised by Tallman, Commissioner of the General Land Office, as to the probable tenor of that office's decision, which he promised to be forthcoming within a week or ten days. Charges of fraud had been alleged in four affidavits, but the department seemed at that time to be divided on whether or not such filing constituted fraud. It is apparent from the correspondence and activities of Kimball, as well as letters from Samuel L. Herrick, a land lawyer of 22 years' experience in Washington, that Kimball was advised in no uncertain terms that it was altogether probable that proceedings to cancel the claims would be recommended on the ground that the entries had not been made for the benefit of the individual locators, and also that the patents theretofore issued to the Big Horn were being subjected to investigation because of the similarity of the circumstances under which locations and entries had been made with a view of proceedings for the cancellation of said patents. The actual decisions regarding

these claims were rendered on August 1, 1913. While cancellation proceedings were directed in the first and third, it was provided for a patent of 60 acres as to the first, on the ground of the apparent interest of the two Alfords and Lamb, and 20 acres as to the third, on the ground that the corporation stood as one individual and was, therefore, entitled to only 20 acres on the one discovery; provided, however, the Big Horn relinquished the remainder of both entries. In such case proceedings would be unnecessary. The "Islands" claim was held up on other grounds.

It was during the July trip that Kimball became aware of the probable release of certain tracts in the vicinity of Greybull and Basin, to permit testing for gas. During a conference regarding patents, the Commissioner, in view of the department's recommendation to the chief executive, broached the subject of the proposed release and inquired whether or not that would help the situation. Kimball thereupon made inquiry as to just how the Big Horn could profit thereby, in view of the governmental policy regarding filing of claims, and was directed to consult with his attorney, referring to Mr. Herrick, who had been representing the Big Horn in Washington. Herrick advised Kimball to make the entries in the names of eight individuals, and for their own benefit. With such advice, and the probability of the release of the lands in the near future, Kimball returned to Sistersville, and called together as many of the directors of the Columbia and Big Horn as could be found, and after repeated conferences decided to file upon the lands for their own benefit.

E. A. Durham, a director, forwarded a message by wire to Lamb, advising him not to act until the arrival of Kimball. In the meantime, Lamb, by virtue of publicity in the local papers to the effect that two tracts were to be released, had posted the same in the names of eight of the directors for the benefit of the Big Horn, and started moving drilling materials onto what was later designated as the Jackson claim. On July 30th, Kimball, acting under instructions of his attorney and what he conceived to be the ruling of the land department, arrived in Wyoming with six names to which

he expected to add those of Lamb and W. A. Armstrong, if the latter would go along. Lamb was then beginning to "spud in" for the first well. The order of the President was actually signed on August 2nd. On August 4th, or prior thereto, the two 160-acre tracts were again posted; this time in the names suggested by Kimball, that is, E. A. Durham, A. C. Jackson, W. J. Neuenschwander, G. B. Slemaker, Geo. F. Durham, W. A. Armstrong, C. N. Kimball, and Homer T. Lamb. The notice of entry previously spread upon the records of the county clerk was changed on the morning of the 6th to meet the latter requirements, which amounted to a substitution of the names of Homer T. Lamb for that of Sim Armstrong and W. A. Armstrong for J. C. Jones. Around three o'clock P. M., oil was discovered at a depth of "400 feet plus." Drilling was discontinued, a proper discovery notice posted, and the rig moved to a second location one-half mile distant, where oil was again struck at the same depth. Both wells were reported in the press as abandoned. Precautions were taken to conceal the extent of the discoveries, in order, as Lamb states, to avoid possibility of claim jumpers. Operations were suspended temporarily on the Jackson claim and the drilling equipment moved to the Kimball claim, with like results. A third well was then drilled on each of the two tracts to the Greybull sand (1400-1500 feet), and in both cases water was found instead of oil or gas, as on adjoining claims. In order to meet the contingency, a third tract of 160 acres (the Lane claim) was released on November 14, 1913, and the mayor of Greybull named the eight, who had prior to that time been operating as the Greybull Oil Company, a partnership, to make the tests. Gas was struck in large quantities at 500 feet in the first well. This discovery was made on December 8th. The two inch water line was preempted, pending receipt of larger pipe, and the gas was actually turned into the distributing mains on New Year's day. Other wells on the same property yielded gas. The Greybull papers carried much publicity about the discovery and stated that the partners, as Greybull Oil Company, would sell the gas to the Big Horn Oil & Gas Company. On the day following the annual stockholders' meeting (January, 1914)

of the Columbia Oil Company, the representatives of the Greybull and the Big Horn met in Sistersville, and determined upon the rate which the Big Horn would be charged for gas.

In the fall of 1914 a number of the directors of the Big Horn, including Jones, as well as Slemaker, the latter being one of the Greybull partners, visited the Wyoming properties. Lamb, who was on the ground all the time, was then suggesting sale, and that the two properties must go together. Through the aid of Pennsylvania capital, a refinery was begun. New wells were drilled, and every effort exerted to increase the production, in hopes of a sale. Finally, the Big Horn, the Greybull and the refinery were sold, November 12, 1915, to a Maine corporation, organized for that purpose. At that time, after proper deductions, a balance of $319,493 was paid the Big Horn, $900,000 in stock in the new corporation to the Greybull partners, and certain payments to those advancing money in the refinery. By reason of a re-organization of the Maine corporation, its capital stock was increased from $2,500,000 to $12,000,000 of which $10,000,000 par value was issued, including $8,000,000 par value of common stock, and $2,000,000 par value of preferred stock. The seven partners in the Greybull (Slemaker having sold his interest in the partnership, as well as the Columbia, on August, 1915, to the other partners) received $1,200,000 in preferred stock in exchange for that already held, which stock they later disposed of at a handsome profit.

The minority stockholders rely chiefly upon the proposition that where individuals as directors enter upon government land and start drilling for oil in the interest, and for the use and benefit of a corporation, and afterward without relinquishing possession or any change in their activities they discover oil, and take the property in their own names and sell the same, they will not be permitted to retain the profits of such transaction. This is based on the law as laid down in the case of *Keech* v. *Sanford*, known as the *Rumford Market Case*, decided 1726, and reported in 15 English Ruling Cases 455. There a person possessed of a lease of the profits of a market, devised his estate to a trustee in trust for an

infant; before the expiration of the term the trustee applied to the lessor for a renewal, for the benefit of the infant, which he refused, for certain legal reasons; thereupon the trustee took the lease for himself. The chancellor held that the beneficiary under the trust was entitled to have the new lease held in trust for him. However, in the instant case, Lamb had entered on the land more than two weeks prior to August 2nd, the date of release. Prior to that time he was nothing more than a trespasser, and, consequently, no interest vested in the Big Horn or its shareholders.

The several individuals who composed the Greybull Oil Company, with the exception of Lamb, Slemaker and Geo. F. Durham, were directors in both the Big Horn and Columbia. Lamb was a director in the former, and Slemaker in the latter. And over the period 1913 to 1915, both inclusive, they constituted a majority of the directors in each corporation.

Directors are not technically trustees, but are agents who bear a relation of trust and confidence to their principal. They stand in a fiduciary relation to the corporation and are held to the utmost good faith in their dealings with it. *Sweeney* v. *Grape Sugar Refining Co.,* 30 W. Va. 443. They must manage its business with a view to promote the common interests, and cannot directly or indirectly derive personal profit or advantage from their position which is not shared by all the stockholders. *North American Coal & Coke Co.* v. *O'Neil,* 82 W. Va. 187; *Reilly* v. *Oglebay,* 25 W. Va. 36; *Newcomb* v. *Brooks,* 16 W. Va. 32; *In re Parsons Lumber Co.,* (W. Va.) 218 Fed. 674. Such officers cannot deal for the corporation to their own benefit unless with full knowledge on the part of the corporation. *Percolating Corporation* v. *Ferrodine Chemical Corporation,* 139 Va. 366. All secret profits received by them in any transaction in connection with corporate affairs must be accounted for to the corporation, although the transaction may also be of advantage to the corporation. 7 R. C. L. 459; *Bent* v. *Priest,* 10 Mo. App. 543, affirmed 86 Mo. 475.

The general rule is that a director or other corporate officer cannot acquire an interest adverse to that of the cor-

poration, while acting for the corporation or when dealing individually with third persons. 4 Fletcher Cyclopedia Corporations, section 2281. Just where this fiduciary relationship ends and personal rights attach in ordinary business dealings is sometimes difficult of definition. In *Tierney* v. *Coal Co.*, 85 W. Va. 545, the court, in speaking of a corporate officer's right to acquire property, said: "It is true that if he acquires any interest in an estate in which the corporation already has an existing interest, or where he acquires an interest outside, which the corporation had contemplated and desired acquiring, by overreaching the corporation, or taking advantage of knowledge which he has as an officer of it, such acquisition will be taken to be for the benefit of the corporation, but there is a wide field left for individual activity, and it may be generally said that the legal restrictions which rest upon corporate officers in their acquisitions of property are limited to the property wherein the corporation already has an existing interest, or *in which it has an expectancy growing out of such existing right,* or to cases where the officers' interference by acquiring the property will in some degree prevent or hinder the corporation in effecting the purpose of its creation. 4 Fletcher Cyclopedia Corporations, section 2281." Also, 14a C. J. 116, section 1883.

As indicated in the foregoing quotation, directors or officers of a corporation are not, by reason of the fiduciary relationship they bear toward the corporation and the stockholders thereof, precluded from entering into and engaging in a business enterprise independent from, though similar to, that conducted by the corporation itself, provided they act in good faith and do not interfere with the business enjoyed by the corporation. *Barr* v. *Plate Glass Co.*, 51 Fed. 33, affirmed 6 C. C. A. 260. No hard and fast rule can be laid down as to the line of demarcation. It has been held that a director can avail himself of rights which cannot be secured by or for the corporation itself. *Keokuk Northern Line Packet Co.* v. *Davidson*, 95 Mo. 467. He may act for his own benefit where the corporation is insolvent or for any reason unable to continue in business *(Jasper* v. *Appalachian Gas Co.*, 152 Ky. 68)*; and where there has been a severance of

official relationship, as by resignation or discharge. *Dodge Stationery Co.* v. *Dodge*, 145 Cal. 380. Where directors of a corporation organized a new company of the same general nature as the old, and to transact the same business, a stockholder in the old company was held entitled to notice and an opportunity to participate in the purchase of its stock, proportionate to his holdings in the old company. *Coleman* v. *Hanger*, 210 Ky. 309. In that case it was shown that the new corporation was developed through the good will theretofore established by the old company and by their efforts while acting as directors of the latter, and that the new company received the earnings that should have been received by the old company, except for the formation of the new company.

All of the shareholders and officers in the Big Horn and Columbia, with the exception of Lamb and Armstrong, were located in and around Sistersville. The Big Horn was organized for carrying on operations in Wyoming. Seven-eighths of the stock was held in trust for the Columbia. Five of the six Sistersville men who joined with Lamb and Armstrong in the Greybull partnership were directors in either one or both corporations. These men controlled the destinies of the two corporations. Their business and financial connections were such that they could readily secure money for the operation of the two corporations. Their sound business judgment was acknowledged by all. Stock was bought on the strength of their managerial qualities. The Big Horn had some oil production, but no ready market. It had a large amount of money tied up in pipe and other gas equipment. All available lands in the vicinity were deemed unproductive so far as gas was concerned. It looked as if the gas equipment would soon be worthless, except for junk. The Big Horn surely was contemplating drilling any likely territory that might become available. The land released for development was in the immediate locality of the properties of the Big Horn. So far as the citizens of Greybull and Basin were concerned, the released territory was in fact for the Big Horn—not for any individual or groups of individuals. The towns had enjoyed gas through its efforts, and had in their petitions to the government stated that the

operating company stood ready to make explorations. Lamb moved on the property on July 14th. The mayor of Greybull, who was authorized in the order of August 2nd to designate the parties to make explorations, on request of certain of the directors of the Big Horn, did change the designation to include the eight who formed the Greybull Oil Company. The directors at Sistersville, prior to Kimball's departure, had decided that the corporation as such could not act. Therefore, certain of their number decided to take the offer for their own benefit. In so doing, what, if any, duty did they owe to the individual shareholders?

The defendants devote a considerable space in their brief to corporate disability. They state that a corporation stands on the same footing as an individual, and can patent only twenty acres after a discovery thereon; that while an individual may secure a patent for twenty acres, eight, operating for their own individual benefits, may join together and secure 160 acres in one contiguous tract, by a single discovery within said boundary. Should the same eight make a discovery for the benefit of a corporation, they would be entitled to a patent for only twenty acres. Concealment of such purpose in order to secure a patent for 160 acres for the corporation would amount to a fraud upon the government and make them liable to prosecution. They take the position also that to attempt to explore and make discovery on separate parcels of twenty acres each for the benefit of the Big Horn would have been impracticable for financial reasons. They also state that the Greybull enterprise inured to the benefit of the Big Horn; that they really advanced the inventory of the Big Horn several thousand dollars, to the detriment of the Greybull, in order that the properties might be sold together.

In the transaction of corporate business, reasonable intelligence and good faith are all that is required of the directors. They cannot be held responsible for mere errors of judgment or want of prudence. These directors could have forfeited the rights of the corporation and shareholders to third persons, if acting in good faith. But while occupying such positions of trust, they will not be permitted to receive any per-

sonal advantage without the fullest possible disclosure to and assent of all concerned. 7 R. C. L. 458; *Bosworth* v. *Allen*, 168 N. Y. 157; *Bennett* v. *Havelock Electric Light, etc., Co.*, 21 Ont. L. Rep. 120. The law lays upon such directors the duty of frankness and fair dealing with the shareholders. This doctrine has its roots largely in the principle of public policy. Its application does not depend upon a showing by the *cestui que trust* that there was fraud in the transaction but is applied that others may be restrained from taking advantage of like situations. There may be fraud and the *cestui que trust* unable to show it. The latter is not in control of the transactions but the former are and have the power and opportunity to make a record and develop such facts as may tend to justify their acts. It is in order to prevent the opportunities afforded for wrongful conduct without relief at law that the fullest disclosure to the real owners of the property is required. The information, as well as the designation by the mayor of Greybull, was acquired by virtue of corporate connections. As directors, they had no greater rights than the other stockholders. Before acting they should have exerted a reasonable effort to impart their information to the stockholders. Is is not shown that the mayor of Greybull was acquainted with the stockholders as such or that he knew more than two or three of the directors. There is no reason why he should have preferred any particular group of shareholders in the Big Horn. If the shareholders had possessed the information, they would have had the opportunity to have applied for some of the additional land.

While operations on behalf of the Big Horn might seem impracticable to the directors (and was found so to be by the chancellor), should not the stockholders have been given notice of the situation and an opportunity to act in view of the fact that the dominating spirits of both directorates intended to act on their own behalves? We think so. The diverse aspects of this case presented in the evidence of the different actors show that, whatever the garb, the real outcome was a profit gained by those occupying a fiduciary relationship to the shareholders.

The violation of their fiduciary duty by the trustees will

only be regarded in equity so far as it is necessary to protect innocent and non-assenting stockholders. So far as the question of ratification and laches are concerned, knowledge of the stockholders is necessary before their act, or failure to act, can bar their rights.

Those stockholders, who had the same information possessed by Kimball and associates before the additional land was taken, and those who acquired this information within a reasonable time thereafter and yet made no request or offer to share the risks, are, according to *United Fuel Gas Co.* v. *Cabot,* 96 W. Va. 387, 396, now barred of all rights by virtue of their laches. In that case one claiming certain property under an oil and gas lease, after giving notice to another, stood by and permitted the latter to explore the same, before attempting to assert its legal rights. JUDGE LIVELY, speaking for the Court, said: ''Plaintiff did not attempt to stop him by legal process. It was content to rest upon its notice, and permitted him to expend further money and labor in proving the land as gas producing territory. If the strata had been barren and unproductive there would likely have been no litigation.'' This case reflects the general rule that prompt action is required under such circumstances.

Before determining the rights of the several complainants to an accounting, let us consider for a moment the position of J. C. Jones. He had been a director in the Columbia and the Big Horn until September, 1915, when he sold his stock in the Columbia. He came into the suit and filed an answer, adopting the allegations of the plaintiffs' bill and praying that the relief therein sought be granted, and, also, in the alternative, that if plaintiffs did not prevail, that he might share ratably in the profits of the Greybull partners, on the ground that he was named as one of the original locators, and improperly excluded from the list without his consent. It is admitted that he had notice of all that was going on in his capacity as a shareholder and also as a locator. He had taken an active part in the business of the Big Horn; was on the property in 1914 and also assisted in determining on the price to be paid the Greybull for gas. If he had a right, it is

barred. *United Fuel Gas Co.* v. *Cabot, supra.* His cross-bill was properly dismissed.

Now, in respect to the matter of notice of the complainants, we find that at the stockholders' meeting, January, 1917, the acts of the Greybull Oil Company were ratified by a vote of 3799 to 390, out of the Columbia's 5,000 outstanding shares of stock, and a like vote refusing to authorize suit against the defendants.

The bill alleges, among other things, that during the summer and fall of the year 1915 the several defendants conceived the idea of selling and disposing of their oil holdings as the Greybull Oil Company in the State of Wyoming before it should become generally known to the stockholders of the Columbia Oil Company that said holdings were claimed by them to be for their own use and benefit and not for the use and benefit of the Big Horn, etc.

The answer sets up the fact that the operations of the Greybull were open, notorious and without concealment, and that the property was acquired by or in their names as the sole and exclusive property of said partnership, free and acquit of any right, title or interest, either legal or equitable, of said Big Horn or said Columbia, or anyone else; that contemporaneously with the acquisition of said property and at all times thereafter their activities were well known by all of the directors and many of the stockholders of said Columbia, including many stockholders other than those alleged in and by the bill to be identified in interest with or related to said members of said Greybull Oil Company; that defendants are informed and believe, and on information and belief charge the fact to be, that said facts that said Greybull Oil Company so acquired, claimed, asserted ownership of, managed, carried on, dealt with and disposed of said mining claims, wells, oil and gas production, and the residue of said property, in its own interest and as the sole and exclusive property of said Greybull Oil Company, were so contemporaneously known as aforesaid by the plaintiffs and each and every one of them, and by all of the stockholders of said Columbia Company.

In view of the foregoing pleadings which were duly veri-
fied, it is apparent that the eleven minority stockholders who
do not testify fail to make a case.

In considering the testimony of the remaining five, namely,
W. H. Young (71 shares), G. A. Conklin (35 shares), Geo.
E. McKinney (66 shares), Victor W. Winton (47 shares), and
Lew Wells (32 shares), the chancellor states that "the evi-
dence justifies the finding, and I hold that none of the Grey-
bull partners represented to the plaintiffs, or to any other
persons that all or any part of the properties acquired by
the Greybull Oil Company were intended to be, or were, held
for the benefit of the Big Horn Company, or that the Big
Horn Company had, or was entitled to or would receive any
interest therein or in the proceeds thereof." While this,
in itself, does not amount to a specific finding as to notice, it
has a material bearing on the existence or non-existence of
such fact.

It is admitted on behalf of defendants, and the corporate
records so indicate, that reference was not made to the ex-
istence of the Greybull Oil Company at any of the stock-
holders' meetings prior to that of January, 1916, at which
time it was merely mentioned by Mr. E. A. Durham, in con-
nection with his oral report regarding the sale of the Big
Horn properties. Durham, who was an active officer in the
Tyler County Bank, stated that whenever any of the cus-
tomers of the bank inquired of conditions and affairs in
Wyoming he told them about the situation; that he was always
interested in telling the stockholders, with whom he came in
contact, of the Columbia's affairs. He had a conversation
with Dr. W. H. Young about the middle of September, 1913,
in regard to the formation of the Greybull, at which time the
latter was informed that the operations were being carried
on for the benefit of the individuals composing the partner-
ship, and that if gas was discovered it would be sold to the
Big Horn. Young admits knowledge of the existence of the
partnership and its activities, but expected it was for the
benefit of the Big Horn, until sometime prior to the sale of
the property in November, 1915.

Kimball states that he told Conklin all about the organi-

zation of the Greybull and the reasons therefor sometime prior to the sale of the properties in 1915, while riding in a bus to Middlebourne, a few miles from Sistersville. Conklin places this conversation in the fall of 1913, stating that he bought seven shares more of stock January 10, 1914. He states, however, that Kimball said that the Big Horn had been drilling some new wells, and shut them in.

McKinney relates two separate conferences with Jackson regarding the situation in Wyoming. The context of the testimony places the first between the entry of the Greybull partners on the first two released tracts and the discovery of gas on the third tract. He states that at that time Jackson told him that eight of them had taken up 160 acres, and were going to develop for gas and if they got gas it would be turned into the Columbia "by some arrangements by which they would have to handle it through the companies that were operating there for the Columbia." At the second, McKinney states that Jackson called him into a room at the bank and inquired if it was true that he was going to join in this suit. Jackson admits two conversations, but places the first shortly before the institution of this suit, stating that at that time he questioned McKinney as to whether or not he was going to join Dr. Young as one of the plaintiffs. That sometime thereafter he had a short conversation with Mr. McKinney, when the latter was in the bank, and took him over to the Columbia office, and asked Mr. Durham to talk to him. "These were the only two occasions on which I (Jackson) talked with him."

V. W. Winton attended the stockholders' meeting of the Columbia in 1913, 14, 15 and 16. He never heard any statements concerning operations other than those of the Columbia and the Big Horn. He states that he had a conversation with Archie Long shortly before the latter left Sistersville (May, 1914), and that Long told him that the directors had a meeting and had decided to take a certain part of the Wyoming properties in their own names, in trust for the Columbia Oil Company. Upon being asked if he could recall any further conversation along that line, Winton replied: "Well, I made the remark that I didn't approve of that way of doing."

Long's testimony corroborates the statement attributed to him by Winton.

Wells understood that the Columbia was carrying on the main development in Wyoming under the name of the Greybull Development Company, and that the Big Horn Oil & Gas Company was a subsidiary of either the Columbia or Greybull. He is listed as present at the 1916 stockholders' meeting. Most of his information came "through the stockholders." It was his understanding that the Wyoming operations were to be carried on for the Columbia. Prior to this suit, he heard it noised about that the defendants were claiming the property for themselves. Jackson talked to him after the suit was instituted.

Durham did not talk to either Wells or Winton. Slemaker states he talked to W. J. Cushing, but was not interrogated as to whether he talked to any others. Kimball talked alone to Conklin. Jackson talked to Wells after the institution of this suit. Neuenschwander made no statement concerning specific conversations.

Whether or not Dr. Young and Conklin had notice, therefore, under all the circumstances, would involved a weighing of the evidence, which must be left to the chancellor below. Both admit talking with certain of the directors about the activities in Wyoming, but disagree as to the nature of conversation. The chancellor, as already indicated, found that the directors did not misinform plaintiffs as to who was to profit from the Greybull. Such finding carried with it the fact of notice. We are bound by his decision. *Linger* v. *Watson*, 108 W. Va. 180; *Davis* v. *Trust Company*, 107 W. Va. 141; *McBee* v. *Deusenberry*, 99 W. Va. 176. Notice, however, cannot be imputed to McKinney under this construction, since Jackson denies the early conversation in which McKinney claims to have received certain limited information concerning operations in Wyoming.

Since notice that the directors were operating independently as the Greybull, and for their own benefit, was not shown to have been brought home to Wells, Winton and McKinney, whose evidence supports the allegation that they had no notice, we are of opinion Wells, Winton and McKinney

should recover severally in accordance to the ratio that the stock of each bore to the capital stock of the Columbia at the institution of this suit (5,000 shares), against E. A. Durham, Charles N. Kimball, A. C. Jackson, G. B. Slemaker and the estate of W. J. Neuenschwander (being the directors served with process), respectively, of the separate profits derived by each of the said five defendants by reason of their connection with the Greybull Oil Company. The decree is, therefore, reversed as to Wells, Winton and McKinney, and the cause remanded with directions to the circuit court to determine the amounts due them, respectively, and the proportions thereof for which each of said defendants is severally liable, and decree accordingly; in all other respects the decree appealed from is affirmed. The five aforesaid defendants shall pay the costs in both this Court and the court below.

*Affirmed in part; reversed in part; remanded.*