JOHN B. LAING *et al., v.* ANDREW B. CRICHTON

(No. 6892)

Submitted January 14, 1931.   Decided January 20, 1931.

*MacCorkle, Clark & MacCorkle* and *Rummel, Blagg & Stone,* for appellant.

*Poffenbarger & Poffenbarger* and *Fred O. Blue,* for appellees.

HATCHER, JUDGE:

This is a suit to compel the defendant, A. B. Crichton, as agent for plaintiffs, to account for profits made on a purchase from them.   The total outstanding stock of the Greenbrier & Eastern Railroad Company was 10,000 shares.   Plaintiff Nelson Fuel Company owned 2655 of these shares, which it had authorized its president, plaintiff J. B. Laing, to sell, and which has been generally referred to in this litigation as the "Laing stock".   At the request of Laing, Crichton had a conference with the Chesapeake & Ohio Railway officials on April 6, 1925, one of the purposes of which was to have them purchase the stock of the G. & E. Rr. Co.   Nothing definite was accomplished at this conference, but the officials promised to investigate the representations then made by Crichton.   The Fuel Company was in financial distress.   It was anxious to

dispose of its G. & E. stock, and Laing did not see fit to await further negotiations with the C. & O. On April 15, 1925, he sold the 2655 shares to Crichton at the price of $75.00 a share. The money for this purchase was advanced by four of Crichton's business associates and four of his brothers, and the stock was immediately turned over to them by Crichton as follows: James A. Graham, 75 shares, C. T. McCormick, 75 shares, John W. Walters, 332 shares, John E. Evans, 332 shares, W. G. Crichton, 432 shares, William Crichton, Jr., 332 shares, H. A. Crichton, 577 shares, and J. N. Crichton, 500 shares. On May 22, 1925, Crichton contracted with Union Trust Company of Cleveland, Ohio, (agent for C. & O.) to sell to it on or before June 1, 1925, 8128 shares of the G. & E. stock at $125.00 per share, Crichton to retain cash on hand and accounts receivable of the railroad company, and to pay its current indebtedness. This contract was not executed as arranged but was finally consummated on October 30, 1925, by Crichton's delivering 8047 shares of the stock to Union Trust Company at the price of $140.91 a share, without reservations. The Laing stock was included in this sale.

The circuit court found as follows:

"(1) During the period complained of the relation of principal and agent existed between Laing and Crichton.

(2) Crichton's negotiations for and his final decision of April 15th, 1925, to purchase Laing's stock resulted directly from information and impressions received by him from Van Sweringen and Bernet at and after the Cleveland interviews of April 6th, to the effect that it was either (a) the intention of the Chesapeake & Ohio Railway authorities to buy or (b) the opinion of such authorities that their Company should acquire the Greenbrier & Eastern Railroad; that Crichton concluded therefrom that the Chesapeake & Ohio Railway Company in the near future would offer to purchase the Greenbrier & Eastern Company at the price per share in excess of what he was paying to Laing.

(3) Such information, impressions and conclusions were not fully and fairly disolved by Crichton to Laing, as required by the relationship existing between them."

Pursuant to this finding, the court decreed that Crichton should have accounted to the Fuel Company for $195,220.76 (which was the sum of the profits made on the Laing stock by Graham and associates) as of October 30, 1925, and entered judgment in favor of the Fuel Company against Crichton for that sum, with its accrued interest, amounting to $243,733.10 on December 21, 1929, the date of the decree. An appeal was granted Crichton but it was limited specifically to the measure and the amount of the recovery against him.

The evidence is conclusive that Crichton made no personal profit whatsoever on the Laing stock, but that the profits thereon went entirely to his brothers and business associates. The C. & O. officials knew that Nelson Fuel Company was not in position to exact a high price for the G. & E. stock. Consequently it does not follow that, had Crichton been unreserved with Laing, the latter would have been able to sell his stock to the C. & O. for the price obtained by the former and his associates. Therefore it is not apparent why the lower court selected the profits made on the Laing stock as the precise measure of damages.

Counsel agree that the measure of damages generally applied against a fraudulent agent is such an amount as will compensate the principal for the loss occasioned by the fraud. In more concrete terms the measure has been said to be the difference between the amount received by the principal for the thing sold and its actual value at the time. *Staker* v. *Reese*, 82 W. Va. 764; 27 C. J., subject Fraud, secs. 239 and 244. The actual value of the stock here is the sales value, not the intrinsic value of the stock. For whatever may have been the latter, Laing was in as good position to know it as Crichton. With the above rule limited to the sales value, we see no way to apply it to this situation. The evidence does not disclose that minority holdings of G. & E. stock could have been sold for more than $75.00 a share on the day Crichton purchased the Laing stock (April 15, 1925). Within a few months prior thereto the Deegans stock, consisting of 2441 shares, had been optioned to Laing at $75.00 a share. This option had been permitted to lapse. A few days after the Laing sale, Deegans also sold his stock to Crichton at $75.00 a

share. Counsel for Laing contend that the stock was worth $75.00 a share on the day of Crichton's purchase, plus whatever amount that sum was enhanced by Crichton's information that the C. & O. officials either intended to buy or were of opinion that the C. & O. should buy the G. & E. Rr. (See finding by the circuit court.) This information, alone, did not cause the stock to bring what Crichton later secured for it. It is true that the price of the stock rose spectacularly under his manipulations. But that rise seems due to the facts that he pooled a large majority of the stock, that his pool had adequate financial backing, and that the C. & O. apprehended that the stock might be purchased by a competitor. Until these results were accomplished, there is no evidence of a market for this stock in excess of $75.00 a share. What enhancement of this price, if any, should be attributed to the information that Crichton received, is purely conjectural. Without conjecture there is no way of determining that the stock had a greater value than $75.00 a share on April 15, 1925, or that Laing suffered a loss by Crichton's reticence. It is not permissible, ordinarily, to resort to speculation in such cases. "Damages are not recoverable for the loss of purely speculative benefits, that cannot be estimated by any certain standard." *Fitzsimmons* v. *Chapman*, 37 Mich. 139. 27 C. J., *supra*, sec. 231, and cases cited under note 1. Particularly should speculation be avoided when there is applicable a rule of equity whereby Laing's recovery can be made certain. "A fiduciary is strictly prohibited from making a personal profit out of his fiduciary relation aside from the compensation allowed by law or by his contract with his *cestui que trust*, and where he does so, courts of equity will invariably compel him to account therefor as a trustee. * * * This principle is applicable not only to regular recognized trustees, but also to all persons occupying a *quasi*-fiduciary relation, such as agents * * *." 15 Am. & Eng. Ency. Law 1199, 1200. For additional authority on this doctrine see Pom. Eq. Juris. (4th Ed.), sec. 959; Mechem on Agency, (2nd Ed.) secs. 1224-5; *Robertson* v. *Chapman*, 152 U. S. 673, 681. Included in the deal with Union Trust Company were 155 shares of stock owned by

Crichton personally, 2325 shares held by Meadow Creek Coal Company, 1627 shares held by the Manor Coal Company, and 1345 shares held by Beachly Coal Company. Crichton owned 49/100 of the capital stock of the Meadow Creek Coal Company, and was the majority owner of the stock of the other two corporations. (All of the G. & E. stock held by the Manor and Beachly Companies was purchased after Crichton's conference with the C. & O. officials on April 6, 1925.) Counsel for Crichton submit a computation showing that Crichton's direct profit on his 155 shares was $6,341.05 and that his indirect profits, through the sales of this stock by the companies in which he was a stockholder, were $132,664.87, making total profits accruing to him either directly or indirectly of $139,055.92, less $1,665.13, his proportion of 55c a share retained by Union Trust Company for defects in title. The deduction leaves net profits of $137,340.79. (This computation is not challenged.) These profits were the result (under the finding below) of the information obtained and withheld by Crichton as Laing's fiduciary. Under the foregoing authority, it would seem meet that he should account to the Fuel Company therefor. Interest on $137,340.79 from October 30, 1925, to this date is $43,033.44, making the sum of principal and interest $180,374.23. Judgment will accordingly be entered against Crichton in favor of Nelson Fuel Company for $180,374.23. With the judgment of the lower court so reduced it is affirmed.

*Modified and affirmed.*