GEORGE T. CHOUNIS *et al. v.* JOHN LAING *et al.*

*And*

DAVID EVENDOLL *et al. v.* JOHN LAING *et al.*

(Nos. 9300-9318)

Submitted October 14, 1942. Decided December 15, 1942.

*T. S. Clark* and *Conner Hall*, for Chounis and others.

*Fred O. Blue, Harry V. Campbell* and *Blue, Dayton & Campbell*, for Laing and others.

Fox, PRESIDENT:

These causes, which were heard together in the Circuit Court of Kanawha County, come to us on appeals granted by us from a decree entered July 25, 1941. We granted an appeal at the instance of the defendants, and also at the instance of David Evendoll and Elizabeth Evendoll, and the questions raised thereon will be disclosed by this opinion. Throughout this opinion the parties will be referred to as they stood in the court below.

This controversy centers around the activities of The Wyatt Coal Sales Company, a corporation, over a period beginning January 1, 1920, and ending March 31, 1932. The defendants were stockholders, and some of them officers and directors, of said company, and the plaintiffs and certain interveners, were stockholders in other corporations

whose rights and interests are alleged to have been infringed upon to their prejudice, and to the advantage of the defendants. Of the defendants, John Laing, Alex W. Laing, James Martin and the estate of T. J. Robson, as represented by his legatees, his personal representatives, and a trustee of his estate, are particularly charged with the practices complained of, by reason of their admitted domination of the corporations involved, although recovery is sought against all defendants.

Aside from The Wyatt Coal Sales Company, the corporations here involved are the Wyatt Coal Company, organized in 1906, and the MacAlpin Coal Company, organized in 1908. John Laing was the moving spirit in the organization of these companies, although Alex W. Laing and James M. Laing, now deceased, were associated with him from the beginning. James Martin and T. J. Robson came into the picture a little later, and from a date prior to any of the transactions under consideration, and up to the end thereof, John Laing, Alex W. Laing, James Martin, and T. J. Robson, individually, and through their families, including in one instance a fiduciary representation, owned and controlled a majority of the stock of the two companies, which will hereafter be referred to as "Operating Companies", were at all times members of the board of directors thereof, and held executive positions, either in the operating companies or The Wyatt Coal Sales Company, which will be hereafter referred to as the "Sales Company".

The business of the operating companies prospered, and about the year 1912, there was set up within the Wyatt Coal Company, a sales department, and at some time T. J. Robson was put in charge thereof. This department handled the coal production of the Wyatt Coal Company, MacAlpin Coal Company, and other companies with which John Laing was connected, and continued to handle this production until January 1, 1920. A sales organization was set up, offices opened in large cities for the sale of coal, the production of the operating companies advertised in trade journals, and generally the usual steps taken to find and hold markets in which the production aforesaid could

be sold. As showing the magnitude of the business done by the sales department of Wyatt Coal Company, we find that for the years 1912 to 1919, both inclusive, it sold 6,971,064 tons of coal, of which 1,905,579 tons were produced by the Wyatt Coal Company over the entire period, and 155,077 by the MacAlpin Coal Company in the years 1918 and 1919. Of the residue, 3,797,876 tons were produced by the Main Island Creek Coal Company and others during the years 1914 to 1917; 1,066,737 tons by the MacGregor Coal Company in the years 1913 to 1919; 25,289 tons by MacCaa Coal Company in 1917, and 20,506 tons by the MacBeth Coal Company in 1919, all being companies in which the Laings were interested, which interests they later relinquished. During the year 1919, the last year the sales department of the Wyatt Coal Company operated, it handled 457,257 tons of coal of which 228,725 tons were produced by the Wyatt Coal Company and 92,375 tons by the MacAlpin Coal Company.

The Wyatt Coal Sales Company was organized in the year 1917, but except for inconsequential sales made for Wyatt Coal Company in 1917, it did not function as a selling agency until the beginning of the year 1920. Its authorized capital was $100,000.00, later increased to $200,-000.00. At some time $3,300.00 was paid into the treasury of the corporation, but during the year 1920 this sum was refunded. In July, 1920, certificates for 1,000 shares of the par value of $100.00 per share, were issued to the following named persons: John Laing 380 shares; Alex W. Laing 150 shares; James Martin 150 shares; W. H. Warren 140 shares; T. J. Robson 150 shares; J..D. Humphreys 10 shares; J. O. Jenkins 10 shares; and O. H. Hiserman 10 shares. No money consideration was paid for said stock. Transfers of the stock so issued were made prior to December 15, 1922, and on that date a stock dividend of 100% was declared, and an additional issue of 1,000 shares of stock, and when issued the outstanding stock was held principally by John Laing, Alex W. Laing, James Martin, T. J. Robson and the immediate members of their families. In March, 1932, when the entire issue of the stock of the Sales Company was turned back to the operating com-

panies, it was held as follows: John Laing 530 shares, Margaret S. Laing 100 shares, Louisa V. Laing 100 shares, Gertrude E. Laing 100 shares, Alex Webster Laing 260 shares, Alex Wright Laing 10 shares, Mary Wright Laing 100 shares, James Martin 150 shares, Mrs. James Martin 200 shares, D. W. Martin 20 shares, Thomas J. Robson 270 shares, Alice E. Robson 100 shares, J. D. Humphreys 20 shares, O. H. Hiserman 20 shares, and J. O. Jenkins 20 shares. So it appears that at that time only 60 shares of the stock were held outside of the Laing, Martin and Robson families, and Hiserman and Jenkins were then closely associated with the so-called Laing interests, and were employees of either the Sales Company or of the operating companies.

Some time around January 1, 1920, those in control of the affairs of Wyatt Coal Company and MacAlpin Coal Company conceived the idea of setting up a sales agency, outside either company, for the purpose of selling the production of the two companies, and that of the other coal companies. They explain the advisability of such action by saying that the production of the two companies was expanding, and give other plausible reasons therefor. Whether such a course should be pursued was, in our opinion, a matter for stockholder determination, and a decision on the part of a majority of the stockholders to do so would have been binding on the two operating companies. In the circumstances, we think that was a matter which should have been submitted to the stockholders. particularly where the existing agency was to be discontinued, and it was contemplated that its property and good will were to be turned over to a new sales agency. Such property and good will were an asset of the Wyatt Coal Company, and certainly its stockholders were entitled to the value thereof. An offer to permit the stockholders of Wyatt Coal Company alone to subscribe to the stock of the sales agency in proportion to their stockholdings in the coal company would, in our opinion, have legalized the transaction.

But this course was not followed. The Laings, Robson, and Martin, with their close associates, assumed control

of The Wyatt Coal Sales Company, and, without cost to themselves, had its stock issued as above stated. They appropriated the property and good will which the sales department of Wyatt Coal Company had acquired, and, without paying anything therefor, without any corporate action on the part of the coal company, and without notice to its stockholders, deprived them of a valuable asset. We do not assume or charge that in so doing the leading· participants in these transactions had it in mind to defraud the stockholders of the Wyatt Coal Company. It is not necessary to impute such motive. They may have believed that it was good business practice to divorce the selling from the operating side of their companies, and that, in doing this, it was of no consequence to stockholders of the coal company whether the production was sold by an agency organized by themselves, or by a wholly independent agency in which no stockholder of the operating company had an interest, and in a sense this is true. But this does not answer the charge laid at their door. That charge is that, being directors of Wyatt Coal Company, to say nothing of their dominating position as stockholders, they were under a duty to administer the affairs of the company in the interest of all stockholders, and not for their own benefit; and that when, through the instrumentality of the Sales Company they appropriated to themselves the property and good will of the sales department of the Wyatt Coal Company, and thereafter secured to themselves huge profits, derived in large part from the sale of the production of the operating companies, also under their control, such conduct constituted a fraud upon the rights of the stockholders of the Wyatt Coal Company and to a lesser degree the other operating companies as well.

The Wyatt Coal Sales Company greatly prospered. Immediately, after January, 1920, it became the exclusive sales agency for Wyatt Coal Company and MacAlpin Coal Company. In 1922 the Morrison Coal Company was organized by the Laings, Martin, Robson and associates. Their control of that company was as complete as was their control of Wyatt and MacAlpin, and the Sales Company

became the exclusive agency for the sale of the production of Morrison which began in 1924. Through the years 1920 to 1931, both inclusive, the sales agency sold for Wyatt Coal Company 4,584,702 tons of coal; for MacAlpin Coal Company 4,586,231 tons; for Morrison Coal Company 2,151,755 tons; for MacGregor Coal Company, in 1920 and 1921, 171,308 tons; for MacBeth Coal Company, in 1920-22, 304,572 tons; and during the entire period for outside mines 4,189,009 tons, or a grand total of 15,993,597 tons. For most of this period a commission of eight per cent was charged, the reasonableness of which is not questioned. The business of the Sales Company was wholly financed by retaining, for a longer period than was customary in the coal trade, the amount received from the sales of the coal produced by the operating companies. It is admitted that settlement for coal sold was postponed for three to eight months beyond the time when it was customary, according to practices of the trade, to make such settlement. The record shows that at the end of each calendar year, from 1920 to 1931, the sales agency was indebted to Wyatt and MacAlpin in large sums of money, and it is assumed that the indebtedness at the end of the year fairly represents the average indebtedness to the operating companies. It appears that the sales agency advanced money to the Morrison Coal Company. The stockholders of the operating companies knew, or could have known, of this indebtedness, as the same was reported to them at each annual stockholders' meeting, which, apparently, were held in March of each year.

In addition to the stock dividend of $100,000.00 declared in 1922, the Sales Company paid liberal cash dividends to its stockholders, and also paid salaries to some of the defendants who were at the same time being paid salaries by the operating companies. When the stock of the Sales Company was transferred to the operating companies as of March 31, 1932, there was an actual surplus of $238,-290.94, after the payment of certain interest which will be hereinafter referred to, and in addition thereto 50 shares of the capital stock of the West Virginia Land and Im-

provement Company, all of which was distributed among the defendants.

Some time after the Sales Company got under way as a sales agency for the operating companies, and certainly as early as 1927, certain stockholders of the operating companies, including plaintiff David Evendoll, made complaint against the Sales Company setup. Apparently, these complaints grew and became widespread. Those in control of the Sales Company realized the necessity of dealing with these complaints and the existing dissatisfaction among the stockholders of the operating companies, for as one witness said, "If there was anything that won't go together, it is dissatisfaction and success". With this thought in mind the stockholders of the Sales Company on March 5, 1932, prepared a written proposition, signed by each of them, to be submitted on their part to the stockholders of the operating companies at their annual meetings to be held in March of that year. The operating companies to which the proposition was to be submitted were Wyatt Coal Company, MacAlpin Coal Company, and Morrison Coal Company, and, briefly stated, the proposition addressed to said companies was this: The stockholders of the Sales Company would turn over and transfer to said operating companies all of their stock in the Sales Company, with the suggestion that Wyatt receive thirty per cent thereof, MacAlpin forty per cent, and Morrison thirty per cent, but saving, reserving and retaining to themselves all payments and dividends theretofore received by them, and also all claims, choses in action, rights of action, moneys, and accounts and bills receivable, belonging to the Sales Company, but agreeing to pay, out of such retained assets, all of its accounts, notes and claims as of March 31, 1932, and to pay certain State and Federal taxes which would accrue in point of time as of the last-mentioned date. At separate annual meetings of the stockholders of Wyatt and Morrison, held on March 8, 1932, resolutions were adopted which recited the proposition outlined above, and the same were set out *in extenso* therein, and the proposition was accepted in the following language: "Now, therefore, be it resolved: That, con-

tingent upon a like acceptance by the other so-called operating companies referred to in said agreement, the said proposal and the exceptions, reservations, undertaking, understandings, and conditions therein are accepted by this corporation and are hereby agreed to." At the Morrison meeting 4,336 out of 4,886 shares of stock outstanding were represented in person or by proxy, and 4,291 shares were voted in favor of said resolution. David Evendoll was present as proxy for Mrs. David Evendoll, and voted her 20 shares against the resolution. In the Wyatt meeting 2,996 out of 4,000 shares of stock outstanding were represented in person or by proxy, and 2,916 shares were voted in favor of said resolution. David Evendoll was present in person and voted his 80 shares against the resolution.

On March 14, 1932, the annual stockholders' meeting of MacAlpin Coal Company was held, at which 7,336 out of 8,000 shares of stock outstanding were represented in person or by proxy. David Evendoll was present in person, and represented 120 shares owned by him, and held the proxy of Mrs. David Evendoll for 120 shares owned by her, and voted all of said shares in said meeting. The resolution adopted by Morrison and Wyatt on March 8, was presented. The proposal which had been accepted by Morrison and Wyatt contained the following:

"Upon perfect title to the foregoing being vested in us, we agree to pay all of the Wyatt Coal Sales Company's accounts payable, notes payable, claims, if any, against it, existing as of the close of business on March 31, 1932, and to pay one-fourth (¼) of any lawful taxes imposed upon the assets of the Wyatt Coal Sales Company by the State of West Virginia, or any of its taxing sub-divisions, for the year 1932, and to pay the Federal income taxes of the Wyatt Coal Sales Company for the year 1931, and to pay such part of the Federal income taxes imposed on the Wyatt Coal Sales Company for the year 1932 as is attributable to income earned by that company during the first three calendar months of that year less deductions arising during said three calendar

months and a proper proportion of deductions attributable to the whole year."

When this proposal was submitted to MacAlpin, David Evendoll moved, seconded by James Martin, that the paragraph above quoted be amended to read as follows:

"Upon perfect title to the foregoing being vested in us, we agree to pay, out of the reserve assets, but not otherwise, all of the Wyatt Coal Sales Company's accounts payable notes payable, claims, if any, against it, existing as of the close of business on March 31, 1932, and to pay one-fourth (¼) of any lawful taxes imposed upon the assets of the Wyatt Coal Sales Company by the State of West Virginia, or any of its taxing subdivisions, for the year 1932, and to pay the Federal income taxes of the Wyatt Coal Sales Company for the year 1931, and to pay such part of the Federal income taxes imposed on the Wyatt Coal Sales Company for the year 1932 as is attributable to income earned by that company during the first three calendar months of that year less deductions arising during said three calendar months and a proper proportion of deductions attributable to the whole year. And to pay the respective operating companies the accrued interest on any average balances from the Wyatt Coal Sales Company to the respective operating companies for the period of eight years preceding January 1st, 1932, at the rate of three and one-half (3½) percent per annum thereon, the adjustments to be made and determined by Mr. John Laing, President of the Wyatt Coal Sales Company:

"Provided, However, that the Wyatt Coal Sales Company shall not be required to pay such three and one-half (3½) per cent interest to the operating companies, duly proportioned as between themselves, in and to the extent of like rate of interest on the indebtedness of the Mac-Beth Coal Company to the Wyatt Coal Sales Company, the same being hereby abated; nor shall the Wyatt Coal Sales Company be required to pay such three and one-half (3½) per cent interest in and to the extent that it is not able to

collect like rate of interest from the Morrison Coal Company on the latter's indebtedness to the Wyatt Coal Sales Company, but the collection of the interest from the Morrison Coal Company shall be left wholly to the discretion of the Board of Directors of the Wyatt Coal Sales Company; and

"Provided, Further, that the Wyatt Coal Sales Company shall not be required to pay or collect such three and one-half (3½) per cent interest after the 31st day of December, 1931."

The parties to the original proposal, on behalf of themselves and the other stockholders of The Wyatt Coal Sales Company accepted the proposed amendment, whereupon the original proposal, as amended was accepted and agreed to in the identical language employed by Morrison and Wyatt in their acceptance and agreement to the original proposal on March 8. On the vote on the resolution, as amended, 7,136 shares, including the shares of David Evendoll and his wife, were cast in favor of the resolution and none against.

On March 29, 1932, special meetings of the stockholders of Morrison and Wyatt were held to pass on the amendment to the proposal and resolution adopted at the MacAlpin meeting on March 14. The amendment was unanimously approved by each meeting. David Evendoll, representing his wife by proxy in the Morrison meeting, and his own stock in the Wyatt meeting, moved in each meeting that the amendment made in the MacAlpin meeting be approved and accepted. At the Morrison meeting 4,336 shares were represented and all were voted in favor of the amended resolution. In the Wyatt meeting 2,876 shares were represented and all were voted in favor of the amended resolution. John Laing, having been authorized to make an adjustment as to interest in accordance with the provisions of the amended proposal and resolution, made a report to Morrison and Wyatt on March 29. Under this report there was due MacAlpin $99,063.79 and to Wyatt $29,058.03. The same report was later made to MacAlpin, and payment of interest in accordance with said

report was made, and with this payment the adjustment of these disputes remained undisturbed until the year 1936, when plaintiff, George T. Chounis, first raised the question which is paramount in these causes.

The suit of Chounis is based on his ownership of 20 shares of Wyatt Coal Company stock, and in that suit David Evendoll intervened as the owner of 80 shares thereof. The Evendoll suit is based on his ownership of 120 shares of stock in the MacAlpin Coal Company, and his wife, Elizabeth Evendoll, intervened as the owner of 120 shares thereof in her own right, and by reason of her alleged beneficial interest in 52½ shares thereof under the will of James M. Laing. In the same relation she intervened in the Chounis suit as to 27½ shares of the Wyatt Coal Company stock. We have herein noted the presence of David Evendoll at the various stockholders' meetings, his interest in and attitude toward the matters of dispute now being considered, and his part in what defendants contend was a complete and final settlement thereof. It should be here stated that the record does not show that Chounis was present at any of these meetings. He would have been entitled to participate in the Wyatt meeting, but he says that the last meeting of the Wyatt stockholders he attended in person was prior to 1920, and there is no substantial contradiction of his statement. However, it appears that his stock was represented by proxy at meetings held in 1928 and 1930, at neither of which meetings was any matter connected with this controversy considered. He says that his suspicion as to wrongdoing on the part of the defendants was first aroused in 1936, and we think his case must be appraised on that statement. The mere fact that Chounis may have received notices of stockholders' meetings, and that if he had attended such meetings he would have learned of the practices of which he now complains, does not, in our opinion, create any impediment to his present suit.

Three outstanding questions are presented on this record: First, was the alleged conduct of the defendants in using The Wyatt Coal Sales Company to appropriate the property and good will of the sales department of the

operating companies for their personal benefit and profit, such a breach of trust as entitles a non-consenting stockholder of said companies to an accounting for all profits earned by the Sales Company; second, was the alleged settlement and adjustment of the controversy arising out of the activities of the Sales Company, made in March, 1932, *ultra vires,* and, therefore, not binding on non-consenting stockholders, or was it *intra vires,* and, therefore, when adopted by a majority of the stock voting, a quorum being present, binding on all stockholders, including the plaintiffs and intervenors in this cause; and, third, does the participation of David Evendoll in the alleged settlement and adjustment made in March, 1932, bar said Evendoll and his wife, Elizabeth Evendoll, from any relief herein as to the stock owned by them in their own right, even though they might otherwise be entitled to recover?

The court below answered the first question in the affirmative; held, as to the second that the corporate action of March, 1932, was *ultra vires* as to non-consenting stockholders, and, therefore, not binding; but as to the third held that the participation of the Evendolls in the March, 1932, settlement bars them from any relief as to the stock held by them in their own right, and reserved the question as to the rights, if any, of Elizabeth Evendoll as to the stock in which she claimed a beneficial interest under the will of James M. Laing. The court also decreed recovery in favor of Mary W. Raisbeck, an intervenor in the Chounis case, and reserved the question of recovery on the part of Maude B. Quarles, another intervenor in said cause. However, since the entry of the decree below the intervening petitions of Mary W. Raisbeck and Maude B. Quarles have been dismissed with prejudice, and that fact appearing in the record before us, we are not called upon to consider their claims on this appeal.

In our discussion of the first question stated above, we can do no better than to first state the position of counsel for the defendants as to the law touching their duties and obligations to the stockholders of the operating companies. Counsel say:

"They, (referring to the Laings, Martin and Robson, the four principal directors of the several corporations involved), as directors and officers, bore a relation of trust and confidence to their principals; as officers and directors it was their duty to manage the business of the corporations, with a view to promote the common interests thereof, and they could not directly or indirectly derive personal profits or advantage from their positions which were not shared by all of the stockholders; and because of their fiduciary or trust relation they would be required to account for any profits which they secretly or unlawfully made at the expense of the stockholders of the corporations. With this statement we believe there will be no issue between us and counsel for appellees as to the relationship, duties and obligations of the four principal defendants, under the law, but our arguments will be divergent in respect of the application of the law to the facts in the case."

These propositions of law are amply supported by the following well-reasoned authorities, in which are included a few of the many cited in the briefs. *Sweeney* v. *Grape Sugar Refining Co.,* 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88; *Tierney* v. *United Pocahontas Coal Co.,* 85 W. Va. 545, 102 S. E. 249; *Tri-State Coal and Timber Land Assn.* v. *Neace,* 92 W. Va. 196, 114 S. E. 569; *Laing* v. *Crichton,* 110 W. Va. 3, 156 S. E. 746; *Young* v. *Columbia Oil Co.,* 110 W. Va. 364, 158 S. E. 678; *Felsenheld* v. *Bloch Bros. Tobacco Co.,* 119 W. Va. 167, 192 S. E. 545, 123 A. L. R. 334; *Hopkins* v. *Bryant,* 121 W. Va. 748, 6 S. E. 2d 246; *Rowland* v. *Kable,* 174 Va. 343, 6 S. E. (2d) 633; *Mienhard* v. *Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1; *Southern Pacific Co.* v. *Bogart,* 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099; *Magruder* v. *Drury,* 235 U. S. 106, 35 S. Ct. 77, 59 L. Ed. 151; *Bird Coal & Iron Co.* v. *Humes,* 157 Pa. 278, 27 A. 750, 37 Am. St. Rep. 727; *Jones* v. *Missouri-Edison Electric Co.,* 144 Fed. 765; *American Creosote Works* v. *Powell,* 298 Fed. 417; Fletcher's Cyclopedia of Corporations, Sections 1199, 2190, 2317, 2511, 3497; 19 C. J. S. 164, 13 Am. Jur. 475-6-7,

and 950; Pomeroy's Eq. Jur. (4th Ed.), Section 1077; 4 Thompson on Corporations (3rd Ed.) 128.

It must be borne in mind that, as to this phase of the case, the question of whether acts of the corporations were *ultra vires* does not arise. It may be that the operating companies then in existence could have decided, by a majority vote of their stockholders, to set up a new sales agency, and turn over to it the existing sales department, provided some compensation was paid therefor, or stockholders of the Wyatt Coal Company given an opportunity to subscribe for stock in the new agency, and thus save their interest in the property and good will being transferred to the new company. But there was no corporate action. The four leading officers, directors of the operating companies, for themselves, their families, and a few close business associates, simply took over the property and good will of the existing sales organization, which had been developed within the Wyatt Coal Company, without asking the consent or approval of any stockholder of that company, and for more than twelve years used that property and good will without the payment of one penny therefor. They did more: They financed the operations of the Sales Company during this entire period by using the funds of the operating companies, paid to themselves salaries and dividends, and at the end of 1931 had accumulated a surplus of approximately $366,862.76 outside of the West Virginia Land and Improvement Company stock. This surplus was reduced by payments of interest under the March, 1932, adjustment to $238,290.94. The gentlemen who set up the Sales Company and operated it in the manner stated above may not, at the beginning, have realized that their acts were unjust to the stockholders of the operating companies; they later impliedly confessed their error, and attempted to and did settle with the great majority of the stockholders of the operating companies. For that they are to be commended, but, in our opinion, the settlement made was not binding on non-consenting stockholders. The lower court held, in effect, that the four leading defendants were guilty of a breach of trust, which made them liable to the stock-

holders of the operating companies for the profits made by the sales agency. We can find no fault with this holding and affirm the same.

But defendants contend that even if they were liable for said profits, the corporate action of the operating companies, in March, 1932, in accepting the proposition of settlement made by the stockholders of the Sales Company, the defendants herein, was binding on each and every stockholder of the operating companies, including the plaintiffs and intervenors; that it was a matter of *intra vires*, on which the majority had the right to impose its will on the minority. We are unable to agree with this contention. Its application to the cases at bar, where the alleged wrongdoers own or control a majority of the stock of the corporations affected, would leave minority stockholders helpless. It is true that an individual stockholder of a corporation may, if he chooses, waive or ratify an illegal act of its officers or directors, and such waiver or ratification, if based on full knowledge of the facts, is binding upon him; but that is different from an imposed ratification by a majority of the stockholders. We think it clear that the officers and directors of a corporation are without power to give away the assets of a corporation, even to a third party; and if this be true, how much stronger should be the rule against their appropriating such assets to themselves. In *Griffith* v. *Blackwater Boom & Lumber Co.*, 55 W. Va. 604, 48 S. E. 442, 447, 69 L. R. A. 124, this Court held: "It follows that the transaction, if within the powers of the corporation, may be consented to, ratified, or acquiesced in by the stockholders, or by the board of directors, if it could be authorized by them", and then goes on to hold that such ratification, with full knowledge of the facts, is binding. But the whole statement is based on the premise "if within the powers of the corporation". Therefore, if the directors of the operating companies, even if acting in the name of the corporations, did not have the right to give away, or to appropriate to themselves, the assets of the companies, how can we adopt the theory that such illegal action may be ratified by any number of stockholders less than the whole? Such ratifi-

cation, in our opinion, is only binding on those who vote their stock in its favor, and does not bind non-consenting stockholders. We are supported in our conclusion by the following authorities: *Berent* v. *Bethlehem Steel Corp.*, 108 N. J. Eq., 148, 154 Atl. 321; 19 C. J. S. 418-428; *Rogers* v. *Hill*, 289 U. S. 582, 53 S. Ct. 731, 77 L. Ed. 1385, 88 A. L. R. 744; 4 Fletcher Cyc. of Corp., Section 2190; *Railway Co.* v. *Woodyard*, 46 W. Va. 558, 33 S. E. 285; *Collins* v. *Hite*, 109 W. Va. 79, 153 S. E. 240; *Felsenheld* v. *Tobacco Co., supra.* We do not think that the cases of *Thurmond* v. *Paragon Colliery Co.*, 82 W. Va. 49, 95 S. E. 816; *Shaw* v. *Davis*, 78 Md. 308, 28 Atl. 619, 23 L. R. A. 294, and *Hodges* v. *Steel Corporation*, 64 N. J. Eq. 807, 54 Atl. 1, 60 L. R. A. 742, strongly relied on by defendants apply to the case at bar. As we view those cases, the acts complained of were of such a nature as the corporation had the power to pass on, and the complaint was that officers and directors profited therefrom. In none of these cases had property of the corporation been appropriated without corporate action, and without any consideration. Our conclusion and holding is that actions of the majority of the stockholders of the operating companies, in adopting the settlements made in March, 1932, were and are binding only on those present and participating in the stockholders' meetings at which the settlements were approved, and, therefore, not binding on plaintiff, George T. Chounis.

A different situation exists with respect to David Evendoll and his wife, Elizabeth Evendoll, as to the stock in the operating companies owned by them in their own right. Elizabeth Evendoll knew nothing of any of the transactions under review, and attended none of the stockholders' meetings. She was represented at all of these meetings by her husband, David Evendoll, who held her proxy and voted her stock. We think she was chargeable with all knowledge of corporate affairs possessed by her husband. The authorities in support of this proposition seem to us convincing. *Gray* v. *Aspironal Laboratories*, 24 Fed. (2d) 97; *Thames* v. *Insurance Co.*, 49 Ala. 577; *Seaman* v. *Ironwood Amusement Co.*, 283

Mich. 220, 278 N. W. 51; 5 Fletcher's Cyc. of Corp., Section 2016; 18 C. J. S. 1254.

The question whether the participation of David Evendoll in the several stockholders' meetings of the operating companies, in March, 1932, bars him, and through him his wife, from recovery, is therefore squarely presented. Evendoll admits that he had certain knowledge of what he considered wrongdoing on the part of Laing and others when he voted for the settlements of March, 1932, but says he did not have full knowledge of such · alleged wrongdoing until the year 1938, a short time before he intervened in the Chounis suit, and instituted his own suit. He says,—and this is his chief reliance—that in 1932 he did not know that the Sales Company was what he termed "a shell," that is, that no actual capital was invested therein, and for this and other reasons he contends that his consent to the settlements made in March, 1932, is not now binding on him.

We think that if the Evendolls are denied relief herein it must be on the ground that, being in possession of sufficient facts to enable them to act intelligently, they deliberately entered into an agreement of settlement as to the alleged wrongdoings of the defendants, and thereby ratified the same. We think such knowledge was had by David Evendoll; that the same is imputed to Elizabeth Evendoll; and that the decree of the court below denying them any relief as to the stock held by them in their own right should be affirmed. Briefly, our reasons for this holding are: David Evendoll first learned of the activities of the Sales Company in 1922; he was a regular attendant at the meetings of the stockholders of the Operating Companies from 1920 to 1932; he had been a director in Mac-Alpin Coal Company since its organization; as early as 1927 he began to make complaints as to the benefits being derived by the Sales Company from the sale of the production of the operating companies; it is inconceivable to us that, with his opportunities, he did not learn of the manner in which the Sales Company was organized, and its business financed and conducted; we think he was fully informed on these matters when he objected to the

adoption of the settlement resolution first presented to Morrison and Wyatt on March 8, 1932, and voted his stock and that of his wife against it, and if he had this knowledge it follows that he had it at the meetings held later in the month. In a conversation with Picklesimer, he complained of the use by the Sales Company of funds of the operating companies. True, he denies this conversation, and he also denies that he offered the amended settlement resolutions, but as to this he is contradicted by the minutes of the several meetings, and by various witnesses who were present and heard him make the motions in question. Evidently, as the commissioner and the trial court held in relation to his offering the amendments, his memory as to these matters is at fault. The very fact that he insisted upon payment of interest by the Sales Company is clear evidence that he believed that company had improperly withheld payment of funds due to the operating companies and was financing its business in that way. The resolutions which, in amended form, he sponsored, recite the payment of dividends, as well as payments of other character, to the defendants, so he must have known of these payments. If he knew that the Sales Company was financing its business with the moneys of the operating companies, the matter of whether it had other financial resource, such as paid in cash capital, was of little importance. Suffice it to say, that we believe that, when he sponsored and voted for the amended resolutions of settlement, he was in possession of sufficient information on which to base his action, and is bound thereby.

Our holding thus far bears upon the rights of Elizabeth Evendoll with respect to the 120 shares of MacAlpin stock, and, indirectly, 20 shares of Morrison stock owned by her. The court below reserved the question of her right to recover as to 27½ shares of Wyatt, and 52½ shares of MacAlpin stock in which she claims a beneficial interest under the will of James M. Laing. This stock was represented and voted by the surviving executor of the James M. Laing estate at all of the meetings of the stockholders of the two companies. The record does

not disclose the power and authority of the executor, but it is assumed that the stock not having been distributed, the power to vote the same was vested in him. This being true, we do not think the question of any alleged breach of trust in his capacity as executor can be determined in these causes. That is a matter which may arise when the executor makes his accounting of the estate in his hands. If we were to hold that the question could be litigated here, no one could ever safely rely on the finality of any corporate action where stock was voted by a personal representative of a deceased person. We think the circuit court should have dismissed the intervening petition filed by Elizabeth Evendoll seeking recovery on the James M. Laing stock, without prejudice to her right, if any, to question the authority and right of the executor to vote said stock as he did, in any suit or proceeding under which the executor may be required to account for his administration of the Laing estate.

The court below decreed that John Laing, Alex W. Laing, James Martin, and T. J. Robson, the active managers of the Sales Company, were severally liable for the profits, dividends, salaries, etc., of that company received by them, and plaintiffs contend that they should have been decreed to be jointly and severally liable. We hold this contention to be well taken. Officers of a corporation, guilty of a breach of trust amounting to a legal fraud are jointly and severally liable therefor. *Benedum* v. *First Citizens Bank*, 72 W. Va. 124, 78 S. E. 656; *Tierney* v. *Coal Co., supra; Young* v. *Columbia Oil Co., supra; Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 84, 40 S. Ct. 82, 64 L. Ed. 141; *Cooper* v. *Hill*, 94 Fed. 582; 4 Fletcher's Cyc. of Corp., Section 2517. As to the other defendants whose liability arises only from their stock ownership, the recovery should be several and only for the profits received in the way of dividends and distribution of surplus.

We think liability survives against the estate of T. J. Robson, and against the trustee of said estate, and the legatees under Robson's will, to the extent of assets in their hands as such derived therefrom. The administrators with the will annexed, having made settlement of

the estate, are hereby relieved of any liability. We do not think this is a case where the proceedings before a commissioner of accounts should be permitted to relieve an estate of its liability for a breach of trust, amounting to legal fraud, not discovered until after the filing of the report of such commissioner. Furthermore, equity is the proper forum for the determination of matters arising out of alleged fraud, and, in view of our holdings in *Steber v. Combs*, 121 W. Va. 509, 5 S. E. 2d 420, and *In re: Long's Estate*, 122 W. Va. 473, 10 S. E. (2d) 791, we doubt whether the commissioner of accounts would have had jurisdiction to pass upon and determine the controversy, had the alleged fraud been discovered and presented to him. We do not think the limitations provided for in Code, 44-2-26, 27 and 28, apply to cases of after-discovered fraud. On these phases of the causes, we affirm the rulings of the court below.

The question of laches is raised. Inasmuch as our holding leaves that question open only as to Chounis, we do not think he is barred of relief thereby. His allegation and testimony that he first learned of the alleged fraud in the year 1936 has not been successfully controverted. After his discovery he moved with reasonable promptness. In that and the following year he sought an adjustment, as is evidenced by correspondence with John Laing, president of the corporations involved, and he instituted his suit early in 1938. We do not think defendants are substantially prejudiced by the death of Robson or the inability of John Laing to testify. Robson died before Chounis had the knowledge on which his suit is based, and, of course, he cannot be charged with laches in failing to act prior to Robson's death. The testimony of Laing could not have added much to defendants' defenses. The important facts on which recovery or non-recovery must be based are singularly free from substantial dispute, and we do not think a situation has been established that would justify a decree denying relief on the ground of laches.

The action of the court below in decreeing recovery to Chounis rather than to the corporation is affirmed. This

being a suit instituted by a plaintiff in behalf of himself and other stockholders similarly situated, and derivative in its nature, the rule would ordinarily be to enter a decree requiring that any recovery be paid to the corporation. But here, by reason of the peculiar circumstances, a personal recovery by a stockholder is justified. The record clearly shows that more than 95% of the stockholders of the operating companies are satisfied with the settlements made in March, 1932, and it would be useless to recognize them as being in any way interested in the case. The simple procedure is to pass on the claims of the few who complain in their individual capacity. In this connection it should be said that we have not failed to take into consideration the small amount of stock in the operating companies represented by the plaintiffs and intervenors, particularly Chounis, as compared with the total of the stock outstanding; nor have we failed to note the apparent satisfaction of the great mass of such stockholders with the settlements made in March, 1932. While recognizing that there is authority for the proposition that a suit instituted by a person holding a small amount of stock should be looked upon with some suspicion, such holdings always recognize the controlling rule that even in such cases, a stockholder, however small his holdings, is entitled to relief upon a proper showing of his rights thereto.

The complaint that the circuit court, in referring the causes to a commissioner for an accounting, should have provided for notice to stockholders of the operating companies, so that they might have opportunity to present their claims, is, we think, without merit. Stockholders not barred of the right of recovery under the principles announced herein, may, if they choose, still intervene, as others have done. That right sufficiently protects them.

The effect of our holdings, on the present state of the record, being to confine recovery to the plaintiff Chounis, the basis of recovery, namely, one-half (½) of one per cent (1%) of thirty per cent (30%) of the profits of the Sales Company, whether represented by dividends, salaries, retained assets or otherwise, excepting salary paid

to Robson, fixed by the court below, is approved. This may not do exact justice, but in the circumstances it is the best that can be done. The order of reference should be modified in respect to certain matters on which, under the principles announced herein, no accounting is required. In all other respects the order of reference is approved.

The decree of the Circuit Court of Kanawha County, so far as it decrees recovery to the plaintiff, George T. Chounis, and so far as it denies recovery to plaintiff, David Evendoll, and intervenor, Elizabeth Evendoll, as to stock held by them in their own right, is affirmed. So far as the said decree reserves the question of the right of Elizabeth Evendoll to recover on account of the stock in which she claims a beneficial interest under the will of James M. Laing, the same is reversed. The decree should be modified to conform with the holdings on other points specifically mentioned. The order of reference entered in the court below will be modified only to the extent of excluding therefrom matters on which, under this opinion, no report or accounting is required. In case No. 9318. George T. Chounis, plaintiff, costs will be awarded to him and against the defendants. In case No. 9300, David Evendoll, plaintiff, and Elizabeth Evendoll, intervenor, costs will be awarded against them and in favor of the defendants. The causes will be remanded to the Circuit Court of Kanawha County for further proceedings not in conflict with the principles and holdings herein announced.

*Modified and affirmed.*