# CHARLESTON.

THURMOND *et al.* v. PARAGON COLLIERY CO. *et al.*

Submitted February 12, 1918.   Decided March 12, 1918.

1. CORPORATIONS—*Stockholders—Right to Vote—Interest.*

   A shareholder in a private corporation is not denied the right to vote on a matter affecting the corporate interest, in a stockholders' meeting regularly called, because his personal interest in such matter conflicts with the interest of the corporation.   (p. 53).

2. SAME—*Contracts—Ratification—Interest of Directors.*

   A contract made by the directors of a corporation, which was either authorized or subsequently ratified by a majority vote of the stockholders in meeting regularly assembled, is not affected by the fact that one or more of the directors had an interest in such contract other than as stockholders in such corporation. (p.53).

3. CONTRACTS—*Restraint of Trade—Sole Selling Agency.*

   Where a coal selling corporation acts as the sole agent in selling all the coal produced by a number of coal producing corporations, a contract of agency between it and one of said companies is not void as being in restraint of trade, where it appears that such agency is not owned or controlled by the producing companies and sells the output of the mines of each of them, as its own individual product, and at such price as it will command in the markets.   (p. 55).

4. CORPORATIONS—*Increase of Capital Stock—Method—Power of Directors.*

   Where a private corporation has issued and sold only a part of its authorized capital stock and engaged in business for sometime, and then desires to increase its working capital, it is within the discretion of its directors as to how the money shall be raised and they may lawfully do so by selling a part or all of its unissued stock, and they have a right to sell it at a price per share previously determined by a majority vote of the stockholders. *Howard* v. *Tatum,* decided at the present term of court.   (p. 56).

5. SAME—*Shareholders—Unissued Stock—Right to Purchase.*

   In such case a shareholder has a right to purchase his pro rata share of such unissued stock.   (p. 56).

6. INJUNCTION—*Discretion of Corporate Directors.*

   As a general rule courts of equity will not interfere by injunction to control the discretion of the directors of a private corporation in the management of its internal affairs.   (p. 57).

Appeal from Circuit Court, Cabell County.

Suit for injunction by J. S. Thurmond and others against the Paragon Colliery Company and others. From a decree partly dissolving and modifying an injunction, plaintiffs appeal.

*Decree modified, and cause remanded.*

*Campbell, Brown & Davis,* for appellants.

*Holt, Duncan & Holt,* for appellees.

WILLIAMS, JUDGE:

This appeal was awarded on the petition of J. S. Thurmond and others, minority stockholders in the Paragon Colliery Company, plaintiffs below, from a decree dissolving in part and modifying an injunction which had been awarded by the judge of the circuit court of Cabell county in vacation, restraining and inhibiting W. E. Deegans and others named, constituting a majority of the directors of said company, from (1) paying any commissions to the Pocahontas-Winifrede Coal Company on coal shipped to the Chesapeake & Ohio Railway Company by said Paragon Colliery Company; (2) from shipping to said Pocahontas-Winifrede Coal Company or upon orders furnished by it, any portion of the output of said Paragon Colliery Company's mine No. 1; and (3) from making sale of 350 shares of unissued capital stock of the last named company.

W. E. Deegans and others named, constituting the majority of the directors, the Paragon Colliery Company, the Pocahontas-Winifrede Coal Company and the Chesapeake & Ohio Railway Company were made defendants and, severally, answered under oath. Defendants, except the Chesapeake & Ohio Railway Company, gave notice that on the 28th of April, 1917, they would move for a dissolution of the injunction. At the instance of plaintiffs the hearing was continued to the 30th of April, at which time they tendered and were permitted to file, over the objection of defendants, an amended and supplemental bill, making the Bank of Mullens and the Rodgers Construction Company parties, and praying that said Deegans and others who, the bill avers, control the Para-

gon Colliery Company, be enjoined from awarding to the Rodgers Construction Company any contracts for the erection of buildings upon its property, and that it be enjoined from paying to the Bank of Mullens any part of a certain note executed by it to said bank, and that, if said note has been paid, said bank be compelled to return the money, and also that said W. E. Deegans, as president of the Rodgers Construction Company, be compelled to disclose under oath the amounts which have been paid to said Rodgers Construction Company for the erection of buildings. At the instance of defendants, the hearing of their motion to dissolve the injunction, as well as plaintiffs' motion for an additional injunction, was continued to May 1st, at which time defendants, except the Chesapeake & Ohio Railway Company, filed their joint and separate demurrer and answer verified by the affidavits of W. E. Deegans, John Faulkner, O. F. Deegans and William Brown, and the motion to dissolve was then heard upon the bill, amended and supplemental bill, the joint and several answers thereto duly verified, and numerous affidavits taken and filed by plaintiffs and defendants respectively, whereupon the court wholly dissolved the injunction in respect to the first and second matters, and modified it as to the third by allowing said Paragon Colliery Company, acting either by its stockholders or board of directors, to sell its unissued stock, and requiring it to be sold at the "best price obtainable," giving preference to the stockholders to purchase the stock in proportion to their respective holdings, instead of selling at the price of $175.00 per share, as was authorized to be done by a stockholders' resolution. The court did not rule on plaintiffs' motion to enlarge the injunction.

The Paragon Colliery Company is a coal mining corporation with an authorized capital stock of $100,000, divided into shares of $100 each, and operates two mines known as Paragon Mine No. 1 and Paragon Mine No. 2. The number of shares outstanding are 650, of which plaintiffs severally own, in the aggregate, 139. At a stockholders' meeting held on the 14th of April, 1917, a resolution was passed ratifying a contract of sale previously made by said company, through

W. E. Deegans its president, to the Chesapeake & Ohio Railway Company, of the entire output of its No. 2 mine, for a period of two years, beginning April 2, 1917 and ending March 31, 1919, at the price of $1.50 per net ton of 2000 pounds, run of mine, f.o.b. at the mine, the Railway Company obligating itself to furnish a full supply of cars to take care of the output, which was about 600 tons daily. At the same meeting another resolution was adopted authorizing payment to the Pocahontas-Winifrede Coal Company, a coal selling corporation, a commission of 3c per ton on all coal shipped under the aforesaid contract with the Railway Company; also a third resolution was passed, authorizing the making of an agreement with the Pocahontas-Winifrede Coal Company permitting it to sell all the coal mined in the year 1917 by the Paragon Colliery Company, except at its Mine No. 2, on a commission of 8% of the selling price; and likewise a fourth resolution authorizing the sale of the 350 shares of unissued stock of said company at $1.75 per share, and providing that the same be offered to the several stockholders in the proportion of their then holdings. Plaintiffs and others, representing 173 shares of stock, protested and voted against these resolutions. At a meeting of the directors of said company, held immediately after the stockholders' meeting adjourned, they adopted the same resolutions, over the protest of the plaintiff J. S. Thurmond, one of said directors.

W. E. Deegans is president and general manager of the Paragon Colliery Company, president of the Pocahontas-Winifrede Coal Company, and likewise executive head of five or six other coal companies engaged in mining and selling coal, and plaintiffs contend that, by reason of his kinship and business relations with certain other stockholders in the Paragon Colliery Company, he dominates them and influences their votes and thereby controls the corporate action in such manner as to serve his own private interests in a way detrimental to the interests of the corporation. This charge is denied by Deegans in his answer and by his affidavit and also by the affidavits of a number of the stockholders over whom it is alleged he exerts an improper influence in directors' and

stockholders' meetings. In addition to these denials by affi-davits, it is altogether unreasonable that said Deegans should desire to make a contract between the two companies which would permit the Pocahontas-Winifrede Coal Company to profit at the expense of the Paragon Colliery Company, for it would be detrimental to his own pecuniary interest. It is shown that he owns 178 shares of the 650 shares outstanding in the Paragon Colliery Company, or a fraction over 27% of its stock; whereas he owns only 50 of the 497-½ shares of outstanding stock in the Pocahontas-Winifrede Coal Company, or only about 10% of its capital. Hence it is apparent that, in any dealings between those two companies whereby a profit would be made by the Pocahontas-Winifrede Coal Company at the expense of the Paragon Colliery Company, it would necessarily result in pecuniary loss to said Deegans. This charge in the bill is not only denied in the answer but is disproved by the affidavits filed.

It is further contended by counsel for plaintiffs that any contract entered into between these two companies, which was supported by the vote of said Deegans, would be illegal because of his official relation as a director on the board of each company. We are not called upon in this case to determine the effect his vote as a director in making the contract would have on its legality, for the reason that all the contracts here involved were either ratified or authorized by a majority vote of the stockholders at a meeting regularly called and in which nearly all the stock was represented.

The reason for denying to a director of a corporation the right to vote on a matter in which he is otherwise interested, than as a stockholder in the corporation, is because of the fiduciary or trust relation he bears toward it. 4 Thompson on Corporations, (2nd ed.), Sec. 4467. But that reason does not apply to a stockholder, and he is not denied his right to vote on any matter properly coming before a stockholders' meeting on account of any private interest he may have which is detrimental to the corporation. 4 Thompson on Corp., Sec. 4467; *Shaw* v. *Davis*, 78 Md. 308, 23 L. R. A. 294; *Windmuller* v. *Standard Distilling & Distributing Co.*, 114 Fed. 491. In *Gamble* v. *Queens County Water Co.*, 123 N. Y. 91, 9 L.

R. A. 527, it was held: ''A shareholder has a legal right at a meeting of the shareholders to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and he in no sense acts as a trustee or representative of others.'' The only restriction upon this right of a shareholder seems to be, that the matter must not be illegal nor ultra vires, and the action of the majority of its shareholders must not be so antagonistic to the corporation as a whole, as to indicate that their interests are wholly outside of the interest of the corporation and destructive of the interests of the minority shareholders. There is no question of the power and the right of the Paragon Colliery Company to make the contract with the Pocahontas-Winifrede Coal Company authorizing the latter to sell its coal on a commission of 8%. It is not an ultra vires act, nor does the contract appear to be detrimental to the interest of the producing company. It is abundantly proven by numerous affidavits of competent witnesses, familiar with the coal trade and the amount of commissions usually paid to coal selling agencies, that 8% of the selling price is a very reasonable compensation. A number of such witnesses say that 10% is more often paid. When it is considered that the selling agency, as a part of its undertaking, guarantees payments for all coal sold and makes collections, 8% of the selling price appears to be a very reasonable compensation.

It is insisted, because the Paragon Colliery Company rejected a bona fide offer made by the Amherst Coal Company, a competitor of the Pocahontas-Winifrede Coal Company, to sell the entire output of its Mine No. 1 for the year beginning May 1st, 1917, and agreeing to guarantee a price of $3.00 a ton for every ton of coal sold, there must have been some sinister motive for rejecting it and making the contract with the Pocahontas-Winifrede Coal Company. This inference is hardly justified we think. It must be presumed the sales agent will sell for the best price obtainable, because the greater the selling price the more money it will receive as commissions, and it might be able to get much more than $3.00 a ton for the coal, whereas the Amherst Coal Company

guaranteed $3.00 per ton net, as a maximum price. So that, as a business proposition, the contract which it made might well be considered a much more beneficial transaction than an acceptance of the Amherst Coal Company's offer, with a guarantee of $3.00 a ton without commissions, would have been, when the rapid advances in the price of coal that were taking place are considered.

It appears that the Pocahontas-Winifrede Coal Company is the selling agency for all the coal produced by the numerous coal producing companies of which W. E. Deegans is president, and for that reason it is urged that the contract is illegal and void as being in restraint of trade, and against public policy. None of the other coal companies appear to be parties to the contract with the Paragon Colliery Company, and, while it is possible, by a series of similar contracts with each of said coal producing companies to bring about a combination among them, acting through a common agency, which would be unlawful, it does not appear that such is the case here. The answer denies that the selling company pools the coal produced by the other companies and sells it at a uniform price. On the contrary, the answer alleged that the coal produced by each company is sold on the market as the particular coal of the company that produces it, and at the best price that can be obtained for it. While it does appear that many of the coal corporations in which said Deegans is interested, own stock in the Pocahontas-Winifrede Coal Company, it further appears that their aggregate holdings amount only to 127-½ shares, and Deegans himself, as an individual, owns only 50 shares, thus making the aggregate number of shares owned by the several producing companies and Deegans only 177-½, which is much less than half the capital stock of said company now outstanding. The other shares appear to be held by individuals. Therefore, the organization of said selling company does not appear to have been made with a view of combining said producing companies for the purpose of fixing a uniform selling price and preventing competition amongst them. On the showing made the contract does not come under the ban of the law as declared by this court in *Pocahontas Coke Co. v. Coal & Coke Co.,* 60

W. Va. 508; *Slaughter, Rec'r.* v. *The Thacker Coal & Coke Co.*, 55 W. Va. 642, and *Charleston Gas Co.* v. *Kanawha Gas Co.*, 58 W. Va. 22.

It is contended that the contract to pay the Pocahontas-Winifrede Coal Company three cents per ton on the output of Paragon Mine No. 2, sold to the railway company, is void, as being purely a gift. We have already pointed out how W. E. Deegans, who is charged with having induced the making of this contract, would be the loser thereby, and in addition to that fact, it appears by the affidavit of O. C. Hoffman, who has been interested in the coal business in West Virginia for the past fifteen years and who is now general sales manager for the Pocahontas-Winifrede Coal Company, that the things that company is required to do, in carrying out the contract with the railway company, furnish a very substantial consideration for the commission which it is to receive. It is required to look after the car supply for Mine No. 2, to keep accounts of the dates of shipments and weights of coal shipped, to keep accounts of the money due on such shipments and make collections thereof, and, in view of the fact that payments by the railroad company are not always made at a time to enable the Paragon Colliery Company to meet its pay roll, it is required to advance the money at such times to meet the expenses of operation. In view of the amount of work to be performed and the responsibility connected with its undertaking, it can not be said that the commission is a gratuity, or even an unreasonable compensation.

It is insisted that the Paragon Colliery Company was prospering and would be able to declare a dividend of at least 60% in another year, and, therefore, there was no necessity for selling its unissued stock to raise the money to pay off an indebtedness which amounted to about $30,000, that it could easily pay this out of its earnings; also, that there was no necessity for its building a number of miner's houses, and a new tipple at one of its mines, as the bill alleged it contemplated doing. These were purely matters of legitimate corporate policy to be determined by the board of directors. How the money should be raised to pay off the indebtedness, whether out of the earnings or by a sale of its corporate stock,

was in the discretion of the directors. After a corporation is organized the disposal of additional shares to increase its working capital is subject to the order and directions of its board of directors, provided only that the maximum capital authorized by its charter be not exceeded. Sec. 23, Ch. 53, Barnes' Code 1918; and *Greenbrier Industrial Exposition* v. *Ocheltree*, 44 W. Va. 626. The board of directors did not, in this instance, take the responsibility of selling the unissued stock, as it might have done, but first submitted the question to the stockholders and they, by a majority vote, authorized a sale of it and fixed the price at which the shares should be sold, which appears to have been the value of a share as then shown by the books of the company. In this matter the corporation acted wholly within its legitimate powers. The stockholders had a clear right to fix the price at which the stock should be sold, and no stockholder had a right to complain of such action, all stockholders being given the right to purchase their pro rata shares at the price fixed. ''When the capital stock of a corporation is increased by the issue of new stock, each holder of the original stock has a right to offer to subscribe for and to demand from the corporation such a proportion of the new stock as the number of shares already owned by him bears to the whole number of shares before the increase. This preemptive right of the stockholder in respect to new stock is well recognized.'' 1 Cook on Corporations, (7th ed.), Sec. 286. However, that author says this rule does not apply to treasury stock of a corporation which has once been issued, but it does apply, he says, to such part of the capital stock as is issued long after the corporation has commenced business, which appears to be the case here. *Eidman* v. *Bowman*, 59 Ill. 444; *Gray* v. *Portland Bank*, 3 Mass. 364; *Way* v. *American Grease Co.*, 60 N. J. Eq. 263; and *Crosby* v. *Stratton*, 68 Pac. 130.

The court's modification of the stockholders' resolution respecting the sale of the stock, requiring it to be sold at the ''best price possible,'' instead of at the price of $175 per share as determined by a vote of the stockholders, would seem to be an unwarranted interference with corporate rights and powers. ''As a general rule, courts of equity will not

interfere by way of injunction to control the discretion lodged in the directors in respect to the internal management of the corporation. To warrant interference in this respect it must appear that the managing officers are acting in excess of their powers or that their action is fraudulent." 3 Elliott on Contracts, Sec. 2551.

The decree of the circuit court will be modified by an order entered here dissolving the injunction in toto, and the cause will be remanded for such further proceedings as may be necessary and proper.

*Decree modified and cause remanded.*