441 S.E.2d 646

Joseph M. PERSINGER, on behalf of himself and other shareholders of Persingers, Incorporated, a West Virginia Corporation; Kenneth T. Williamson; Carol Preston Williamson, Plaintiffs–Appellants,

v.

R. Frank CARMAZZI, Sales One, Inc., a West Virginia corporation; Sales Two, Inc., a West Virginia corporation; John C. Morton; W. Guy Wiles, Jr.; William A. Tantlinger; Persingers Incorporated, a West Virginia corporation; William F. Agee; First Huntington National Bank, N.A., Defendants–Appellees.

No. 21804.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 19, 1994.

Decided Feb. 17, 1994.

684

G. Nicholas Casey, Jr., Paul M. Friedberg,
Lewis, Friedberg, Glasser, Casey & Rollins,
Charleston, for plaintiffs-appellants.

Edward M. Kowal, Cheryl Lynne Connel-
ly, Campbell, Woods, Bagley, Emerson,
McNeer & Herndon, Huntington, for defen-
dants-appellants R. Frank Carmazzi, Sales
One, Inc., Sales Two, Inc., John C. Morton,
W. Guy Wiles, Jr., William A. Tantlinger,
Persingers Inc., and William F. Agee.

William C. Beatty, Daniel J. Konrad, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for defendant-appellee First Huntington Nat. Bank.

NEELY, Justice:

■ This matter is before this Court pursuant to *W.Va.Code* 51–1A–1 *et seq.* [1976][1] on an order of certification from the United States Court of Appeals for the Fourth Circuit. We would point out initially that we are not sitting as an appellate court. Rather, pursuant to *W.Va.Code* 51–1A–1 [1976] our job is simply to answer the questions of law posed by the Fourth Circuit. Thus, we assume the findings of fact given us in the Fourth Circuit Certification Order are correct. *See Mustafis v. Erie Insurance Exchange,* 174 W.Va. 660, 328 S.E.2d 675 (1985).

The findings of fact certified by the Fourth Circuit, in summary, are as follows: The plaintiffs in this action, self-named the "Meredith Persinger Group," (the Persinger Group) held approximately 16% of the stock of Persingers Incorporated (PI), a West Virginia corporation engaged in selling mine and mill supplies in southern West Virginia.

At the annual shareholders' meeting on 2 March 1985, plaintiff Meredith Persinger was removed and defendant Frank Carmazzi installed as president and CEO of PI. In addition, the shareholders elected six directors: Meredith, Thomas and John A. Persinger, and defendants R. Frank Carmazzi, W. Guy Wiles, Jr. and John C. Morton.

Six days after the shareholders' meeting, John A. Persinger, son of PI's founder and nephew of Meredith Persinger, died. John A. Persinger was the controlling shareholder of PI, holding approximately 48% of PI's stock. The First Huntington National Bank (First Huntington) was named executor of his estate. As executor, First Huntington, acting through William Agee, Vice President and Trust Officer of First Huntington, controlled the 48% interest in PI.

Thereafter, Meredith Persinger and Thomas Persinger continued as directors of PI, but refused to attend board meetings. In addition, members of the Persinger Group attempted unsuccessfully to secure an agreement with First Huntington whereby they would be entitled to three members of a seven-member board and Meredith Persinger would be appointed chairman and CEO. On a 17 September 1985 special shareholders' meeting, Mr. Agee was elected as a director of PI to fill the vacancy resulting from John A. Persinger's death.

At the 1 March 1986 annual meeting, the shareholders approved a revision in section 5.4 of the corporation's bylaws that allowed the corporation to purchase for corporate purposes any shares of the capital stock of the corporation available for purchase and giving the corporation priority over any other shareholders to make such purchases.

On 20 November 1986, acting on the request of certain shareholders that their stock be redeemed, PI's directors authorized redemption of 40 shares of the stock owned by one of these shareholders at a price of $220 per share. By letter dated 13 December 1986, Howard M. Persinger, on behalf of himself and fellow shareholders Sylvia P. Lentz, Sarah P. Altizer, and Anna S. Athey, indicated he had been informed that the Board of PI had offered to purchase the shares of the Persinger Group and that the Persinger Group had until 15 December 1986 to accept or reject this offer. Mr. Persinger stated that he and the other shareholders mentioned in his letter wished to continue to own their PI shares if the Persinger Group accepted PI's offer to buy their shares; if, however, the Persinger Group rejected the offer and remained in the corporation, those shareholders requested the Board to offer to purchase their shares. None of the shares of

1. *W.Va.Code* 51–1A–1 [1976] provides:
 The supreme court of appeals of West Virginia may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of this state.

the Persinger Group was offered to PI pursuant to its 15 December 1986 offer.

On 16 February 1987, notice was sent to the shareholders of PI that their annual meeting would be held on 7 March 1987. This notice did not state that the shareholders would be asked to vote on the repeal of section 5.4 of the bylaws, Mr. Carmazzi having determined *after* the notice was mailed that the repeal would be considered.

At the 7 March 1987 annual shareholders' meeting, a total of 69% of the shares voted in favor of repeal of section 5.4. At the annual Board of Directors' meeting held on the same day, the directors voted to redeem all of the shares offered for redemption at a price of $220 per share,[2] boosting the percentage of outstanding stock owned by the Persinger Group from 16.12% to 17.43% and the percentage of outstanding shares owned by First Huntington from 48% to a 52% absolute majority position.

Also on 7 March 1987, First Huntington agreed to grant Mr. Carmazzi the right to purchase First Huntington's shares of PI at a price of $275 per share, subject to Mr. Carmazzi's ability to obtain financing. First Huntington agreed not to sell or agree to sell its shares to any other person for 45 days so that Mr. Carmazzi would have adequate time to pursue financing for the transaction. These negotiations were not disclosed to Thomas Persinger or to the shareholders before or during the directors' and shareholders' meetings on 7 March 1987.

In mid-March 1987, Mr. Carmazzi caused the formation of Sales One, a West Virginia corporation with its principal officers in Charleston, West Virginia. Mr. Carmazzi contributed to Sales One the 40 shares of PI stock owned by him as well as $1,000 and received in exchange all outstanding stock of Sales One. In early April 1987, Sales One caused Sales Two, a West Virginia corporation with its principal place of business in Charleston, West Virginia, to be formed as a wholly-owned subsidiary of Sales One.

On 13 March 1987, Mr. Carmazzi submitted a financing plan to the National Bank of Commerce (NBofC), in response to NBofC's requirement that 100% of PI stock be purchased if it were to make a loan to Mr. Carmazzi to finance the buyout of PI. The plan provided for the purchase of the remaining outstanding shares of PI by means of merger. On 17 April 1987, Mr Carmazzi and NBofC executed a loan agreement whereby NBofC agreed to lend Mr. Carmazzi $1,800,-000. To secure the loan, NBofC required Mr. Carmazzi's personal guarantee and pledge of all stock of Sales One, Sales Two and the PI stock owned by Sales One as well as a first lien security interest in substantially all of the assets of PI upon the merger of Sales Two and PI.

On 17 April 1987, Sales One and Sales Two jointly borrowed $1,537,800 from NBofC. From these proceeds, Sales One acquired all of First Huntington's PI shares or 52.45% of issued and outstanding PI stock at a price of $220 per share. Thereafter, Mr. Carmazzi, through Sales One and Sales Two, proposed to PI a merger agreement under which (i) Sales Two would be merged into PI, with PI as the surviving corporation; and (ii) each of the common shares of PI outstanding before consummation, other than the stock of PI owned by Sales One, would be converted into the right to receive $222 in cash. This figure arose as a result of a Coopers & Lybrand appraisal of PI stock as of 28 February 1987.

On 18 April 1987, notice was mailed to all PI directors that a meeting would be held on 27 April 1987 to consider the Sales One and Sales Two offer. At the 27 April 1987 directors' meeting, a majority of PI directors, with Mr. Carmazzi abstaining and Thomas Persinger dissenting, voted to approve the merger agreement and submit it to the PI shareholders. Also at that meeting, Mr. Agee resigned as a PI director, with defendant William A. Tantlinger, a friend of Mr. Carmazzi, elected to succeed Mr. Agee.

On 28 April 1987, notice was mailed to all PI shareholders that a shareholders' meeting would be held on 19 May 1987 for the pur-

---

**2.** On 30 April 1986, at the request of Mr. Carmazzi and for general corporate purposes, Coopers & Lybrand, independent certified accoun-

tants, had appraised the fair market value of a minority interest of PI common stock to be $220 per share.

pose of considering and acting upon the merger of PI and Sales Two. Included in the notice was a statement describing dissenting shareholders' rights to appraisal and the appraisal reports.

By a 5 May 1987 letter to Mr. Carmazzi, Southeast Bank (Southeast), trustee of a deceased PI shareholder holding 5.92% of the corporation's outstanding stock, indicated that he estimated the cash offer to be low and requested the meeting with Mr. Carmazzi to discuss receiving a higher value for his shares. On 11 May 1987, Southeast and Joseph M. Persinger instituted the present action on behalf of themselves and all other shareholders against the defendants named in this action. In their complaint, the plaintiffs sought to enjoin the merger of Sales Two into PI and claimed damages against the directors. The district court refused to issue a temporary restraining order on the merger.

On 21 May 1987, Sales One offered to sell its 5,592 PI shares acquired from First Huntington to PI for a price of $275 per share. A directors' meeting was called for 27 May 1987 to consider the offer. On 26 May 1987, plaintiff Joseph M. Persinger, as well as other members of the Persinger Group, offered to purchase the shares offered to PI by Sales One for $285 per share. Provided that such a purchase and sale were consummated, Joseph M. Persinger stated that he would make a tender offer to all PI shareholders to purchase their shares for $300 per share. On 27 May 1987, Sales One amended its offer to sell its 5,592 PI shares to PI, conditioning the offer to prevent the resale of the shares to any member or entity representing the Persinger Group.

At the 27 May 1987 directors' meeting, a majority of the PI directors rejected the Sales One offer. Having rejected that offer, they did not consider the Joseph M. Persinger offer, which was conditioned on the PI purchase of its stock offered by Sales One.

On 29 May 1987, the PI shareholders voted to approve the merger of Sales Two into PI by a margin of 68% to 31%. On the same day, the merger was consummated. The plaintiffs and all other members of the Persinger Group effectively dissented from the merger. As a result of the merger, the shares of Southeast, Joseph M. Persinger and all other minority shareholder have been converted to the right to receive $222 per share. Mr. Carmazzi and Sales One remain as sole PI shareholders.

This case is before the Court on four certified questions:

1. Did West Virginia law require advance notice that a vote to repeal Bylaw § 5.4 would be considered at the annual shareholders meeting held on March 9, 1987?

2. Do the facts state a claim under West Virginia law that the defendants or any of them breached any fiduciary duties they owed to PI's minority shareholders?

3. If the answer to either 1 or 2 is yes, is the remedy of the minority shareholders limited to the statutory valuation procedure under W.Va.Code § 31–1–123?

4. If the answer to 3 is no, what additional remedies do the minority shareholders have under West Virginia law?

We address these questions *seriatim.*

## I.

■ The first certified question asks whether West Virginia law required advance notice that a vote to repeal Bylaw section 5.4 would be considered at the annual shareholders meeting held on 9 March 1987.

Under West Virginia law, shareholders are entitled only to receive notice of the place, day and hour of the annual meeting. *W.Va. Code* 31–1–19 [1975] of the West Virginia Corporation Act provides:

> Unless otherwise provided in the bylaws, written notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose of [sic] purposes for which the meeting is called, shall be delivered....

Section 29 of the *Model Business Corporation Act*, 2d Ed., (Model Act), which is identical to *W.Va.Code* 31–1–19 [1974] in its notice requirements and its omission of a requirement that notice of the purpose of the annual meeting be given, explains why such notice of purpose is not required:

The text of section 29 reflects an important difference between the annual meeting and a special meeting. Since the earliest days of corporate practice, the annual meeting has been regarded as a forum for free expression of shareholder views, whether or not sought by management. Thus the Model Act does not require that a notice of an annual meeting state the purpose or purposes for which the meeting is called, though it does so require in the case of special meetings. Indeed, it could not properly require that the notice of an annual meeting state the purposes for which the meeting is called in the sense of precluding consideration of any other matters, since that would limit the freedoms of stockholders to discuss matters of interest to them and restrict them to matters designated by management.... *Model Business Corporation Act Annotated,* Second Edition, (1971) at p. 599.

The official commentary to section 7.05 of the revised Model Act supports the position that notice of an annual meeting need not set forth the purposes of the meeting:

> Notice of all special meetings must include of the purpose or purposes for which the meeting is called and the matters acted upon at the meeting are limited to those within the notice of the meeting. By contrast, the notice of an annual meeting usually need not refer to any specific purpose or purposes, and any matter appropriate for shareholder action may be considered. As recognized in subsection (b), however, other provisions of the revised Model Act provide that certain types of fundamental corporate changes may be considered at an annual meeting only if specific reference to the proposed action appears in the notice of the meeting. *See* §§ 10.03 [Amendment of Corporate Charter], 11.03 [Merger], 12.02 [Sale of Corporate Assets other than in ordinary course], and 14.02 [Dissolution]. *Model Business Corporation Act Annotated,* official comment to § 7.05 (3d Ed.1984) at pp. 548–549.

The West Virginia Corporations Act, patterned after the Model Act, recognizes the same four narrow exceptions to the limited rule that no advance notice is required. Under our Act, notice need be given only when shareholders will be required to vote on an amendment to the articles of incorporation,[3] merger,[4] sale of assets,[5] or dissolution.[6] No other exceptions are mentioned. Nowhere does the West Virginia Act provide that prior notice of a proposed bylaw amendment is required before it may be considered at an annual meeting:

**3.** *W.Va.Code* 31–1–107(b) [1974] provides:

> Written notice setting forth the proposed amendment [to the articles of incorporation] or a summary of the changes to be effected thereby shall be given to each shareholder of record entitled to vote thereon within the time and in the manner provided in this article for the giving of notice of meetings of shareholders. If the meeting be an annual meeting, the proposed amendment or such summary may be included in the notice of such annual meeting.

**4.** *W.Va.Code* 31–1–117 [1974] provides:

> ... Written notice [that a proposed plan of merger or consolidation will be considered at an annual or special meeting] shall be given to each shareholder of record, whether or not entitled to vote at such meeting, not less than twenty days before such meeting, in the manner provided in this article for the giving of notice of meetings of shareholders, and, whether the meeting be an annual or a special meeting, shall state that the purpose or one of the purposes is to consider the proposed plan of merger or consolidation.

**5.** *W.Va.Code* 31–1–121(b) [1974] provides:

> Written notice [of a vote at a meeting of shareholders on a sale of all or substantially all of the corporation's assets] shall be given to each shareholder of record, whether or not entitled to vote at such meeting, not less than twenty days before such meeting, in the manner provided in this article for the giving of notice of meetings of shareholders, and whether the meeting be an annual or a special meeting, shall state that purpose or one of the purposes is to consider the proposed sale, lease, exchange or other disposition.

**6.** *W.Va.Code* 31–1–126(b) [1974] provides:

> Written notice shall be given to each shareholder of record entitled to vote at [a] meeting [to consider the advisability of dissolving the corporation] within the time and in the manner provided in this article for the giving of notice of meetings of shareholders, and, whether the meeting be an annual or special meeting, shall state that the purpose, or one of the purposes, of such meeting is to consider the advisability of dissolving the corporation.

The initial bylaws of a corporation shall be adopted by its board of directors. The power to alter, amend or repeal the bylaws or adopt new bylaws, subject to repeal or change by action of the shareholders or members, shall be vested in the board of directors unless reserved to the shareholders or members by the articles of incorporation. The bylaws may contain any provisions for the regulation and management of the affairs of the corporation not inconsistent with the law or the articles of incorporation. *W.Va.Code* 31–1–17 [1974]

Thus, a bylaw like section 5.4 may be proposed, amended or repealed by act of the shareholders at an annual meeting without advance notice.

## II.

The second certified question asks whether the facts certified by the Fourth Circuit state a claim under West Virginia law that the defendants or any of them breached any fiduciary duties owed to PI's minority shareholders.

The plaintiffs argue that majority shareholders in a corporation owe a fiduciary duty to the minority shareholders as do the officers and directors. According to the plaintiffs, when directors of a corporation are on both sides of a transaction, those directors are required to demonstrate their utmost good faith. The plaintiffs assert that the defendants violated a fiduciary duty to the minority shareholders by gaining advantage as a result of an improper use of their fiduciary position to effect the merger of PI and Sales Two and to eliminate the minority shareholders.

■ In assessing the fairness of events surrounding the merger transaction, we must consider two aspects: fair dealing and fair price. Fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors and how the approvals of the directors and stockholders were obtained. Fair price relates to the economic and financial considerations of the proposed merger. *See* Moore, *The "Interested" Director or Offi-*

*cer Transaction,* 4 Del.J.Corp.L. 674, 676 (1979).

### A.

■ Part of fair dealing is the obvious duty of candor. *See Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.Supr.1983). Moreover, one possessing superior knowledge may not mislead any stockholder by use of corporate information to which the latter is not privy. 15 U.S.C. §§ 78ff and 78j(b) [Securities Exchange Act of 1934, § 10(b)] and rules promulgated by the Securities and Exchange Commission thereunder, particularly Rule 10b–5; *Dirks v. Securities and Exchange Commission,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *United States v. Chestman,* 947 F.2d 551 (2nd Cir.1991). The plaintiffs allege that the appellants violated their fiduciary duty by scheming the repeal of Bylaw section 5.4, which had given PI the right to purchase its own shares, in order to enable Mr. Carmazzi to purchase the absolute majority percentage of stock held by First Huntington and then buy out the shares of the corporation.

■ The plaintiffs' contention, however, contradicts both the facts certified by the Fourth Circuit and West Virginia Law. According to paragraph 14 of the Fourth Circuit's statement of facts, Mr. Carmazzi decided only after notice was mailed that the repeal of section 5.4 should be considered by the shareholders. Neither First Huntington nor Mr. Agee, the majority shareholders of the corporation, had notice before the annual meeting that a proposal to repeal section 5.4 of the bylaws was to be placed before the shareholders. Such lack of notice defeats the plaintiffs' contention that a plan had been concocted before the annual meeting to repeal the bylaw.

Furthermore, it is well-settled in West Virginia that "[a]lthough directors may occupy a fiduciary capacity in some instances, such relationship is lacking in others." *Bank of Mill Creek v. Elk Horn Coal,* 133 W.Va. 639, 57 S.E.2d 736, 748 (1950). It is equally well-established that at a shareholders' meeting, each shareholder, even a director-sharehold-

er, represents himself and his own interests and in no sense acts as a fiduciary for either minority or majority shareholders. As we stated in *Thurman v. Paragon Colliery Co.,* 82 W.Va. 49, 95 S.E. 816, 817–818 (1918):

> The reason for denying to a director of a corporation the right to vote on a matter in which he is otherwise interested than as a stockholder in the corporation is because of the fiduciary or trust relation he bears toward it. But that reason does not apply to a stockholder, and he is not denied his right to vote on any matter properly coming before a stockholders' meeting on account of any private interest he may have which is detrimental to the corporation. In *Gamble v. Queens County Water Co.,* 123 N.Y. 91, 25 N.E. 201, 9 LRA 527, it was held: 'a shareholder has a legal right, at a meeting of the shareholders, to vote upon a measure even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his interests solely, and he in no sense acts as a trustee or representative of others.

Therefore, all majority shareholders acted within their right to vote for the repeal of § 5.4 and violated no fiduciary duty to minority shareholders.

#### B.

■ The plaintiffs also assert that their property and voting rights were seriously affected after the 7 March 1987 redemption of corporation stock because, as a result of the retirement of the shares purchased, absolute majority control was shifted into the hands of First Huntington.[7] The plaintiffs contend that the merger arose as a result of the plan developed by the defendants to enable Mr. Carmazzi to acquire the majority of stock.

A West Virginia corporation has the general power to redeem its own stock. Under

W.Va.Code 31–1–83 [1974] (captioned "Rights of Corporation to acquire and dispose of its own shares"), "a corporation shall have the right to purchase, take, receive or otherwise acquire, hold, own, pledge, transfer or otherwise dispose of its own shares."

We may assume that if the plan were shown to be illegal, *ultra vires* or fraudulent, it might constitute a breach of fiduciary duty. We may also assume that a breach would occur if majority stockholders used their voting power for their own benefit, for some self-serving purpose adverse to the interests of the corporation and its stockholders as such. We have no such case here.[8] The record clearly shows that the plan did not originate with the defendants. The offer to sell was put forward by various minority stockholders who requested that the Board offer to purchase their shares if the Persinger Group remained in the corporation.

In short, the fact that First Huntington gained a majority of the voting stock by dint of the 7 March 1987 redemption is not in itself a badge of fraud. The purchase and retirement of some shares of common stock necessarily have the effect of increasing the proportionate voting power of all other holders of common stock. As the Fourth Circuit's statement of facts shows, the percentage of the outstanding stock of PI owned by the Persinger Group increased in the same proportion as First Huntington's. The Persinger Group lost no voting power by the transaction, but had been and remained minority stockholders. *See Baker v. Standard Lime & Stone Co.,* 203 Md. 270, 100 A.2d 822 (1953). We find no breach of duty in the Board of Directors' vote to redeem corporate stock.

#### C.

Finally, the plaintiffs allege that the defendants devised and executed a plan to freeze out the minority shareholders of any benefit

---

7. It is shown that while the interest of the Persinger Group increased from 16.12% to 17.43% by reason of the action taken, the interest of First Huntington increased in the aggregate from 48% to a 52% absolute majority position.

8. Likewise, we find no self-serving or ulterior motive in the Board's failure to consider the 27

May 1987 offer by Joseph M. Persinger to purchase the PI shares held by Sales One. Simply stated, Mr. Persinger's offer was conditioned on the purchase and sale of PI shares to PI by Sales One. Because the Board rejected the Sales One offer, the circumstances necessary for consideration of Mr. Persinger's offer never existed.

from their ownership or investment in the corporation by PI's cash-out merger. According to the plaintiffs, the elimination of minority shareholders by merger for the benefit of one selected shareholder is not a legitimate business purpose and is recognized under general corporation law as a breach of a fiduciary duty.

Under the business purpose doctrine, a corporation's merger transaction caused by a majority stockholder that occurs solely for the purpose of cashing out minority stockholders fails to meet the business purpose requirement. *Singer v. Magnavox Co.*, 380 A.2d 969, 978 (Del.Supr.1977). In *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. Supr.1983), however, the Supreme Court of Delaware struck down the business purpose requirement articulated in *Singer, supra*, stating:

> In view of the fairness which has long been applicable to parent-subsidiary mergers ..., the expanded appraisal remedy now available to shareholders, and the broad discretion of [a court] to fashion such relief as the facts of a given case may dictate, we do not believe any additional meaningful protection is afforded minority shareholders by the business purpose requirement."

 We have never agreed with the business purpose doctrine because attempting to infer the motivations behind a majority stockholder's buyout of minority shares is like trying to catch the wind in a net. In the often clashing cross-purposes and constant friction of haggling and dickering that characterize a corporation, it is perfectly reasonable for a majority shareholder to rid himself of minority shareholders who he perceives may compromise fundamentally that corporation's interests. Consequently, our rule in West Virginia is that when a majority stockholder or majority stockholders seek to effect a corporation's merger, they may do so for any purpose whatsoever, so long as the terms tendered to the minority stockholders accurately reflect the fair market value of the minority interest.

Under *W.Va.Code* 31–1–123 [1974], the West Virginia legislature has created a sophisticated scheme to assure fairness in a cash-out merger.[9] In *Matter of Fair Value of Shares*, 184 W.Va. 96, 399 S.E.2d 678, 682 (1990), this Court expressly acknowledged that cash out mergers are not illegal:

> Courts have developed several general rules regarding dissenters' rights statutes. The first is that ordinarily such a statute provides the exclusive remedy for a dissenting shareholder in the absence of a showing of fraud, unfairness or illegality. *See generally* 18A Am.Jur.2d Corporations § 809. Although our statute does not contain any specific provisions as to exclusivity, we agree with the general rule.

The facts in the case before us show no fraud, unfairness, or illegality on the part of the defendants in the cash-out merger. Indeed, the cash-out merger was required by NBofC—the financier of the purchase—and not by any of the defendants. Moreover, it appears that Mr. Carmazzi, through his personal guarantee backing up the NBofC loan was willing to accept financial exposure in order to restore morale and end the disruption and strife caused by the Persinger Group.

In sum, we conclude that the statement of facts contained in the Fourth Circuit Certification Order makes no showing that the minority shareholders were treated unfairly, that the defendants acted improperly with regard to the minority shareholders or that

9. *W.Va.Code* 31–1–123 states in pertinent part:
 (d) If within thirty days after the date on which such corporate action is effected the fair value of such shares is agreed upon between any such dissenting shareholder and the corporation, payment therefor shall be made within ninety days after the date on which such corporate action was effected, upon surrender of the certificate or certificates representing such shares. Upon payment of the agreed value the dissenting shareholder shall cease to have any interest in such shares.

 (e) If within such period of thirty days, a dissenting shareholder and the corporation do not so agree, then the corporation shall within thirty days after receipt of the written demand must be given within sixty days after the date on which such corporate action was effected, file a complaint in a court of general civil jurisdiction requesting that the fair value of such shares be found and determined, or the corporation may file such complaint at any time within such sixty-day period at its own election.

the defendants gained any particular advantage as a result of an improper use of their fiduciary position. Because the answers to certified questions 1 and 2 are no, questions 3 and 4 of the certified questions need not be addressed.

Certified questions answered.